Charles Edward ALIFF, Appellant,

v.

The STATE of Texas, Appellee.

No. 60578.

Court of Criminal Appeals of Texas.

Feb. 3, 1982.

Frank O. McClendon, III, Tyler, for appellant.

A. D. Clark, III, Dist. Atty. and William D. Saban, Asst. Dist. Atty., Tyler, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, DALLY and TEAGUE, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for the offense of involuntary manslaughter. The punishment is imprisonment for five years.

The appellant presents seven grounds of error; he contends: results of a blood sample were improperly admitted because the sample was obtained in an unlawful search and seizure; appellant's cross-examination of a state witness was unduly limited; results of an out-of-court experiment were improperly admitted; there was a fatal variance between the allegations in the indictment and the proof presented at trial; appellant's requested jury charge on a lesser included offense was erroneously denied; the prosecution incorrectly implied that the appellant had been in prior trouble with the law; the prosecutor engaged in improper jury argument during the punishment stage of the trial.

The appellant contends that the taking of a sample of blood from his body was an unlawful search and seizure under the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution. Additionally the appellant asserts that the sample was obtained in violation of Article 6701*l*–5, V.A.C.S.

The evidence reveals that the appellant was traveling along a highway driving in an erratic manner at high speeds. Officer Sellers of the Department of Public Safety observed the appellant's erratic driving and saw him drive on the shoulder of the road and pass another car on the righthand side; the officer pursued the appellant at speeds in excess of 100 miles per hour. The appellant failed to stop for a red light and collided with another vehicle. The driver of the other vehicle died a few hours later. The appellant was also severely injured and was transported to a nearby hospital. The supervising officer, after being informed of the circumstances surrounding the collision, requested that a blood sample be taken from the appellant. The appellant was semi-conscious at the time and did not give his consent to the taking. Testing revealed that the appellant's blood contained 0.14 per cent alcohol by weight. This evidence was admitted at trial.

The appellant first argues that the taking of his blood sample was in violation of Article 6701*l*–5, supra, formerly Article 802f, V.A.P.C. The article states in part:

"Section 1. . . . Any person arrested may consent to the taking of any other type of chemical test, or tests, to determine alcoholic content of his blood, but he shall not be deemed, solely on the basis of his operation of a motor vehicle upon the public highways of this state, to have given consent to any type of chemical test other than a chemical test, or tests of his breath."

While consent to obtain a blood sample is not constitutionally required when an accused is under arrest, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) the statute has enlarged upon what is constitutionally required. The statute requires that consent be obtained from those individuals under arrest. However the statute has been construed to apply only to those persons under arrest, it does not

apply to persons not under arrest. *Darland v. State*, 582 S.W.2d 452 (Tex.Cr.App.1979); *Bennett v. State*, 522 S.W.2d 507 (Tex.Cr. App.1975). In the case at bar the appellant was not under arrest when the blood sample was taken. Therefore, Article 6701*l*–5 has no application to the present case and appellant's contention is without merit. *Darland v. State*, supra; *Bennett v. State*, supra.

▮▮▮ The appellant contends that the taking of the blood was an unlawful search and seizure under both the Texas and United States Constitutions. The withdrawal of blood from a person is a search. The Supreme Court in *Schmerber v. California*, supra, stated:

"But if the compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment . . . It could not reasonably be argued . . . that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that Amendment."

Additionally, the taking of a blood sample is a search and seizure under the Texas Constitution. *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978), cert. denied 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979); *Smith v. State*, 557 S.W.2d 299 (Tex.Cr.App. 1977); *Escamilla v. State*, 556 S.W.2d 796 (Tex.Cr.App.1977).

▮▮ While the taking of a blood sample is a search and seizure, as was noted above, not every warrantless search is constitutionally impermissible. In *Schmerber* the defendant was convicted of the offense of driving an automobile under the influence of an intoxicating liquor. At the direction of a police officer a blood sample was obtained over the defendant's objections. The Supreme Court concluded the search was not unlawful. The Court noted that the percentage of alcohol in the blood diminishes as soon as a person stops drinking

and the evidence could not be secured if an officer had to wait until a search warrant was obtained. Thus the Court stated that since the defendant was under arrest when the sample was taken and because of the already ongoing destruction of evidence, the warrantless search was "an appropriate incident to petitioner's arrest."

However in the present case the facts do not squarely fall within the holding of *Schmerber*. Here the appellant was unconscious and not under arrest when the blood sample was taken. The Court in *Schmerber* reached its conclusion only on the facts of that record and the Court added:

"That we today hold that the Constitution does not forbid the State's minor intrusions in an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."

However, we find it unnecessary to determine whether the holding of *Schmerber* extends to the facts of the present case.

In the case at bar we find that the reasoning and holding of *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) control. In that case the defendant was not under arrest when police officers obtained a scraping from his fingernails. The police at the time had probable cause to arrest the defendant but had not done so. The police believed that the defendant was involved in the strangulation murder of his wife. The officers observed a dark spot on one of the defendant's fingers and were aware that in strangulation offenses residue is often left on the offender's fingernails. The police asked if they could get a scraping and the defendant refused and started rubbing his hands together. The police nonetheless obtained the scraping and it was used in evidence against the defendant at his trial.

The Supreme Court determined that the obtaining of the fingernail scraping was a search but that it was lawful. The Court concluded that because of the existence of probable cause to arrest, the very limited nature of the intrusion upon the defendant,

and the readily destructibility of the evidence there was no violation of the Fourth Amendment.

■■■ Similarly the warrantless taking of a blood sample despite the lack of an arrest does not violate the Fourth Amendment. First, as with the scraping of a fingernail, the taking of a blood sample is very unintrusive. Indeed the taking of blood is "routine in our everyday life." *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). Second, alcohol in blood is quickly consumed and the evidence would be lost forever. Finally, even though the appellant was not under arrest and the officers were still investigating there was probable cause to arrest the appellant for involuntary manslaughter. Therefore we conclude that the exigencies of the situation in *Cupp v. Murphy*, supra, which justified the warrantless search also existed in the present case. Several other jurisdictions have reached similar results. *Minnesota v. Oevering*, 268 N.W.2d 68 (1978); *DeVaney v. Indiana*, 259 Ind. 483, 288 N.E.2d 732 (1972); *Van Order v. Wyoming*, 600 P.2d 1056 (Wyo.1979); *Oregon v. Heintz*, 286 Or. 239, 594 P.2d 385 (1979); *Montana v. Campbell*, 615 P.2d 190 (Mont. 1980). See Annot. 72 A.L.R.3rd 325 (1976). Therefore we conclude that the taking of the blood sample was not an unreasonable search and seizure.

■■■ The appellant in his brief relies upon our holdings in *Ferguson v. State*, supra; *Smith v. State*, supra; *Escamilla v. State*, supra. In each of those cases we noted that under the Texas Constitution that the taking of blood was a search and seizure. However those decisions should not be construed as enlarging the scope of the Article I, Section 9 of the Texas Constitution beyond the scope of the Fourth Amendment. In each of those cases the obtaining of a blood sample without consent or warrant were held to be error. No exigencies existed as in *Schmerber* or *Cupp v. Murphy*, which justified the warrantless searches. The samples were taken to determine blood type, which would remain constant. Thus under either the Texas Constitution or the

United States Constitution the searches would have been unlawful. In the present case the exigency of rapidly dissipating alcohol justified the search. The appellant's ground of error is overruled.

The appellant next argues that his cross-examination of a state witness was improperly limited. Joe Hogan, a chemist, testified as the State's expert on testing for and the effects of alcohol at various levels of the blood. The appellant sought to cross-examine a witness using a 1938 report by the Committee on Tests for Intoxication of the National Safety Council. The appellant's counsel asked the chemist to base his answer on the report and to state what amount of alcohol in a person's blood would make him intoxicated. The State's objection was sustained.

■■■ Generally, a book, report, or other publication can be used during cross-examination of an expert witness to impeach or discredit him. The material would not be admissible as direct evidence since its admission would violate the hearsay rule; but it is admissible to show any deficiency in the knowledge of the expert and help the jury ascertain the weight to be given his testimony. See, Annot., 60 A.L.R.2d 77 (1958); VI Wigmore, Evidence, Sec. 1700 (Chadbourn rev. 1976). However, before the publication can be used in cross-examination the publication must be recognized as "authority" or "standard authority" in the particular field of expertise. *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949); *Webb v. Jorns*, 530 S.W.2d 847 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n. r. e.) In the case at bar the appellant totally failed to establish that at the time of trial the 1938 report by the Committee on Tests for Intoxication of the National Safety Council was recognized as authority on the amount of alcohol in the blood necessary to intoxicate a person. Therefore, the trial court did not err in not allowing the appellant to use the report in cross-examining the witness.

■■■ The appellant asserts that the trial court erred in admitting evidence de-

rived from experiments offered without showing that the experiments were conducted under conditions similar to the original act or event. A police officer testified that a week after the offense was committed he conducted an experiment with his automobile. The officer testified that he drove his automobile at 55 miles per hour and saw the signal turn green when it first came in sight after he drove out of a dip in the highway. He drove through the green and yellow cycle of the light and on seeing the red signal was able to make a gradual controlled stop approximately 450 feet before entering the intersection where the fatal collision occurred. The city traffic engineer later testified without objection that the timing sequence of the traffic signal had remained the same since the day of the collision.

The testimony concerning the cycling of the light was admissible; the evidence established that the sequence was the same at the time of the collision. As for the experiment, we stated in *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980) cert. denied 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980) the following:

> "Generally, the results of out-of-court experiments are admissible in the discretion of the trial court if the experiment was made under similar conditions to the event to which the results of the experiment relate. The fact that the experiment was not made under exactly the same conditions goes to the weight and not admissibility of the evidence."

The appellant's trial objections were that a proper predicate had not been laid and that it was not shown that the traffic light was functioning in the same way it was on the date of the accident. The trial judge did not abuse his discretion in admitting this evidence in the circumstance presented.

■■■ The appellant contends that there was a fatal variance between the name of the deceased as alleged in the indictment and the name of the deceased proved by the evidence. The appellant argues that the middle name of the deceased was shown to be different than that alleged in the indictment. However, a middle name or initial may be disregarded; a variance between the allegation and the proof of the middle name or initial is neither material nor fatal. *Martin v. State*, 541 S.W.2d 605 (Tex.Cr.App.1976). The ground of error is overruled.

■■■ The appellant contends that it was error not to include in the charge to the jury instructions on the law of the lesser included offense of criminally negligent homicide. The appellant was convicted of the offense of involuntary manslaughter for which the required culpable mental state is recklessness. V.T.C.A. Penal Code, Section 19.05. There was an objection to the charge given because it did not include a charge on the offense of criminally negligent homicide for which the culpable mental state is criminal negligence. V.T.C.A. Penal Code, Section 19.07. Criminally negligent homicide is a lesser included offense of involuntary manslaughter since criminal negligence is a lesser culpable mental state than recklessness. Article 37.09(3), V.A.C.C.P.; V.T.C.A. Penal Code, Sections 6.02(d) and 6.03(c)(d); *Moore v. State*, 574 S.W.2d 122 (Tex.Cr.App.1978).

■■■ The difference between the two culpable mental states required to establish these offenses lies in whether the actor himself perceives the risk of harm his conduct creates. *Moore v. State*, supra. This was explained in *Lewis v. State*, 529 S.W.2d 550 (Tex.Cr.App.1975):

> " 'Reckless conduct as defined by V.T.C.A. Penal Code, Section 6.03(c) involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. Criminal negligence as defined by V.T.C.A. Penal Code, Section 6.03(d) involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the result thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.' "

■ The appellant offered no evidence; nevertheless, we must consider all of the evidence viewing it in the light most favorable to the appellant's contention, *Gavia v. State*, 488 S.W.2d 420 (Tex.Cr.App.1972), that he was entitled to the charge on lesser included offense.

■ The evidence shows that the appellant was operating a motor vehicle on Highway 31 in an erratic manner at high rates of speed, at times estimated in excess of 100 miles per hour. It was also shown he passed a vehicle driven by Billy Ray House on the right shoulder of the highway. Subsequently, Highway Patrolman Sellers, who was then traveling in the opposite direction, noticed appellant's vehicle because of the high rate of speed appellant's vehicle was traveling. Sellers turned his vehicle around and proceeded to chase appellant's vehicle, using a flashing red light, but no siren in an attempt to stop appellant. Sellers admitted that appellant might not have been aware that he was traveling behind him. Sellers kept appellant's vehicle in his sight continuously for several miles except when appellant entered a dip in the highway, which was located approximately four-tenths of a mile from the fatal intersection. At that time, he lost sight of appellant's vehicle for a few seconds. When he saw appellant's vehicle, it was then colliding with another vehicle. It was also shown that appellant locked the brakes of his automobile causing a skid which started within the intersection and extended 38 feet to the estimated point of collision. The skid indicates that the automobile turned to the left. There is nothing in the evidence presented which indicates that the appellant was unaware of the risk his conduct created. On the other hand, the evidence which has been summarized shows acts which reveal conscious risk creation—a conscious disregard for the risk involved in driving in the manner in which the appellant was driving. That the appellant's senses may have been dulled by the use of alcohol would not reduce the culpability from recklessness to criminal negligence. Therefore there was no need to submit the charge on criminally negligent homicide; the trial court did not err in refusing to submit such a charge.

The appellant argues that the State made reference to a prior void conviction and implied that the appellant had been in trouble with the law. The appellant refers to one instance during the innocence-guilt phase, one instance during the punishment phase, and two instances during the closing argument in the punishment phase. The ground of error is multifarious and nothing is presented for review. Nonetheless we have reviewed the record and will discuss the appellant's contentions.

■ During the guilt-innocence phase of the trial the State asked one of the investigating police officers of the collision who he had talked to. He responded, "I talked with Houston County Probation Officer." The unresponsive remark was objected to and the jury was instructed to disregard the statement. The appellant's rights were adequately protected by the instruction to disregard.

■ During the punishment phase the State presented the testimony of the County Clerk of Houston County. However, before he could testify about any particular records the appellant objected and no other testimony was presented. The appellant has failed to show any harm.

■ The appellant also complains that the State's jury argument during the punishment phase made reference to the void prior conviction. However, the appellant only made general objections to the jury arguments; nothing is presented for review. The ground of error is overruled.

■ The appellant in his remaining ground of error contends that the State was permitted to improperly argue before the jury during the punishment phase of the trial. Appellant asserts that it was error for the State in its argument to attack the appellant's failure to ask his witness about the appellant's character and reputation. The appellant called several witnesses and asked if they thought the appellant could abide by the terms and conditions of probation. No questions concerning character or

reputation were asked. The appellant's reputation and character were both relevant to punishment and the failure to elicit such evidence was fair comment for the State. Article 37.07(3)(a), V.A.C.C.P.; *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979) cert. denied 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). The ground of error is overruled.

The judgment is affirmed.

TEAGUE, Judge, dissenting.

Appellant was convicted for committing the offense of involuntary manslaughter and a jury assessed his punishment at five years' confinement in the Texas Department of Corrections.

He complains on appeal, inter alia, of the failure of the trial court to charge the jury on the lesser included offense of criminally negligent homicide. The indictment, which states the offense of involuntary manslaughter, see V.T.C.A. Penal Code, Sec. 19.05(a)(1), omitting the formal introductory and concluding portions, reflects the following:

\*    \*    \*    \*    \*    \*

... CHARLES EDWARD ALIFF did then and there recklessly cause the death of an individual, CHARLES HALDO BLOODSWORTH, to-wit: the said Charles Edward Aliff while then and there driving and operating a motor vehicle at a greater rate of speed than permitted by the laws then and there governing the rate of speed of motor vehicles upon public highways in the State of Texas, and proceeding and going in a westwardly direction along Highway 31 in the City of Tyler, Smith County, Texas, and upon arriving at or near the intersection of said Highway 31 with Loop 323, all within the City of Tyler, Smith County, Texas, the said Charles Edward Aliff did then and there fail to stop his said vehicle at a duly and legally authorized and existing traffic control signal light which said traffic control signal light, was then and there legally and duly

placed and located at and near the center of said intersection, and which said traffic control signal light was then and there red requiring all vehicles, such as the said Charles Edward Aliff was then and there driving, to stop prior to entering into the said intersection, but the said Charles Edward Aliff after failing to stop at said traffic control signal light at said intersection, did then and there drive said motor vehicle into said intersection at a greater rate of speed then permitted by the laws then and there governing the rate of speed of motor vehicles upon public highways in the State of Texas, and did thereby collide with another vehicle which had previously entered into said intersection and was proceeding within said intersection along said Loop 323 going south, and which other vehicle was occupied by Charles Haldo Bloodsworth and the said Charles Edward Aliff did then and there and thereby cause the said Charles Haldo Bloodsworth to be crushed and killed, and the said Charles Edward Aliff was then and there aware of but consciously disregarded the substantial and unjustifiable risk that said result would occur, and said risk was of such nature and degree that its disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the standpoint of the said Charles Edward Aliff; [1]

\*    \*    \*    \*    \*    \*

V.T.C.A. Penal Code, Sec. 19.05(a)(1)(2) provides in pertinent part as follows:

(a) A person commits an offense if he:

(1) recklessly causes the death of an individual; or

(2) by accident or mistake when operating a motor vehicle while intoxicated and, by reason of such intoxication, causes the death of an individual.

V.T.C.A. Penal Code, Sec. 19.07, the Criminally Negligent Homicide statute, provides as follows:

---

1. The indictment also alleged a violation of V.T.C.A. Penal Code, Sec. 19.05(a)(2), but this was abandoned on motion of the State after both sides rested.

(a) A person commits an offense if he causes the death of an individual by criminal negligence.

\*    \*    \*    \*    \*    \*

The definitions of "recklessly" and "criminal negligence," as provided by V.T.C.A. Penal Code, Sec. 6.03(c) and (d), are as follows:

(c) *A person acts recklessly*, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct *when he is aware of but consciously disregards a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

(d) *A person acts with criminal negligence*, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct *when he ought to be aware of a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. (emphasis added)

In *Day v. State*, 532 S.W.2d 302 (Tex.Cr. App.1976), Presiding Judge Onion wrote for a majority of this Court, and discussed when an offense may be a lesser included offense. *Day* involved the question whether or not, where the main offense was burglary with intent to commit theft, but the evidence raised the issue of criminal trespass, it was necessary for the trial court to charge on the latter offense. In answering the question in the affirmative, Presiding Judge Onion first quoted Art. 37.09, V.A.C. C.P., which at the time of appellant's trial provided:

An offense is a lesser included offense if:
(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

He then addressed the dissenting opinion of Judge Douglas, and said: "Surely it cannot be contended that if there is evidence raising the issue of a lesser included offense an accused would not be entitled to a charge on the same merely because there is also other evidence which supports proof of the greater offense charged or some other offense." *Id.* at 307. Judge Odom, on State's motion for rehearing, pointedly said: "We must add, however, that whether one offense bears such a relationship to the offense charged is an issue which must await a case by case determination, both because the statute defines lesser included offenses in terms of the offense charged and because it defines lesser included offenses in terms of the facts of the case." *Id.* at 315–16.

Although it is probably true that in most cases a defendant, if guilty at all, will be guilty of the offense charged or nothing, e.g., *Royster v. State*, 622 S.W.2d 442 (Tex. Cr.App.1981); *Watson v. State*, 605 S.W.2d 877 (Tex.Cr.App.1980); *McBrayer v. State*, 504 S.W.2d 445 (Tex.Cr.App.1974); and *Daywood v. State*, 157 Tex.Cr.R. 266, 248 S.W.2d 479 (1952), that principle of law is not at all exclusive, for there are cases, as at bar, where the facts of the case contain elements of two separate, but related offenses.[2] Also, this Court has consistently

---

**2.** The prosecutor in this cause, when reviewing the facts of the case after both sides had rested,

had a most difficult choice to make as to which

held that when the evidence from any source raises an issue that a lesser included offense may have been committed, and a jury charge on the issue is properly requested, the issue must be submitted to the jury. *Ormsby v. State*, 600 S.W.2d 782, 785 (Tex. Cr.App.1980).

Criminally negligent homicide may be a lesser included offense of involuntary manslaughter. See *Ormsby v. State*, supra; *Moore v. State*, 574 S.W.2d 122 (Tex.Cr. App.1978). Where the primary or main offense alleged is involuntary manslaughter, this Court makes the determination on a case by case basis whether or not a charge on the lesser included offense of criminally negligent homicide should have been given.

The distinctions between involuntary manslaughter and criminally negligent homicide, though facially apparent, are often difficult to decipher—until applied to a given set of facts. Succinctly stated, a person recklessly causes the death of another when that person is aware of but consciously disregards a substantial and unjustifiable risk that the death will occur. A person causes death by *criminal negligence* when the person is not but ought to be aware of a substantial and unjustifiable risk that death will occur. In sum, a reckless defendant is aware of the risk created by his or her conduct; a criminally negligent defendant is not but ought to be aware of the risk created. "Reckless conduct . . . involves conscious risk creation . . . Criminal negligence . . . involves inattentive risk creation . . ." *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Cr.App.1975). See also 5 Matthew Bender's Texas Criminal Practice Guide, Secs. 124.04 and 124.05.

*Ormsby*, supra, involved the offense of involuntary manslaughter, and the record reflects that Ormsby was charged by indict-

ment, omitting the formal parts, that he did:

> . . . while intoxicated, knowingly and intentionally operate a motor vehicle and by reason of such intoxication cause the death of DEBORAH STITT through accident and mistake by driving said motor vehicle into a motor vehicle occupied by the said deceased; . . .[3]

This alleged a V.T.C.A. Penal Code, Sec. 19.05(a)(2) offense. See *ante*.

The opinion in *Ormsby* reflects that the defendant undertook the operation of a motor vehicle while in a state of exhaustion and after he had consumed approximately three beers on an empty stomach. The evidence also showed that the defendant had previously driven on the road on which the accident occurred, and that he was familiar with its shoulderless narrow surface and many hills. This Court reversed the conviction because the evidence was deemed sufficient to warrant a charge on criminally negligent homicide, which the trial court had refused to give.

With the above in mind, I will now review the facts of this cause to show why a charge on the offense of criminally negligent homicide was called for by the evidence.[4] Appellant did not testify or offer any evidence during the trial.

The evidence shows that appellant was operating a motor vehicle on Highway 31 at high rates of speed, at times estimated in excess of 100 miles per hour. Occasionally, he drove his vehicle in an erratic manner. It was also shown he passed a vehicle driven by Billy Ray House on the right shoulder of the highway. Subsequently, Highway Patrolman Sellers, who was then traveling in the opposite direction, became attracted to appellant's vehicle because of the rate of speed at which appellant's vehicle was trav-

---

paragraph of the indictment he wished the jury to thereafter consider, for there was evidence going in both directions. However, by electing as he did, he brought into issue the question whether or not the lesser included offense of criminally negligent homicide was in the case.

3. Excluding the name of the deceased, the wording of the second paragraph of the indict-

ment in this cause, which was dismissed, is virtually identical to that found in *Ormsby*, supra.

4. In doing so, I give only the facts most favorable to the issue presented, which this Court's decisions require. See *Day v. State*, supra.

eling. Sellers turned his vehicle around and proceeded to chase appellant's vehicle, using a flashing red light, but no siren, in an attempt to stop appellant. Sellers admitted that appellant might not have been aware that he was traveling behind him. Sellers kept appellant's vehicle in his sight for several miles until Sellers entered a "dip" or "rise" in the highway, approximately four-tenths of a mile from the fatal intersection-Highway 31 and Loop 323. At that point, he lost sight of appellant's vehicle for a few seconds. When he next saw appellant's vehicle, it was then colliding with another vehicle. By the evidence, after going over the "rise," appellant locked the brakes on his automobile, which caused it to turn or swerve to the left. From this evidence, I believe it is reasonable to infer that appellant was attempting to avoid colliding with vehicles later shown to be driven by Mrs. Billie Owens and Charles Haldo Bloodsworth. Appellant's vehicle left 38 feet of skid marks before the fatal impact between his vehicle and Bloodsworth's. The collision between appellant's vehicle and Bloodsworth's caused Bloodsworth's vehicle to collide with Owen's car. As a result of the collision, Bloodsworth sustained fatal injuries. Also, due to the collision, appellant was rendered unconscious and remained unconscious for some period of time until after he was administered treatment at a local hospital.

Though there was testimony that this intersection was the most dangerous intersection in the City of Tyler, based on the frequency of accidents occurring at that location, no evidence was offered to show that appellant had ever previously traveled through this intersection. There was conflicting testimony as to whether appellant accelerated his speed before entering the intersection, although it was undisputed that appellant "braked" his vehicle prior to his vehicle colliding with Bloodsworth's.

The State argues, "there is no evidence that the appellant was unaware of the risk he was creating," while appellant argues that his "inattention and unmindful acts show that he was criminally negligent."

Whatever appellant's actual point of view toward the other parties involved in the collision might have been, I must assume by his defensive actions that he wished to preserve his own life. Had he been aware that he was in mortal danger, but consciously disregarded that risk, he would have had no reason to try to avoid colliding with the other vehicles by braking and swerving his vehicle to the left. His attempts to avoid the collision, however futile, are evidence that he was unaware of the risk before that time. Contrary to the majority's conclusion, that the facts do not call for a charge on criminally negligent homicide, I believe the evidence adduced can reasonably be viewed as showing either a conscious disregard of a substantial and unjustifiable risk, thus showing recklessness, or a failure by appellant to appreciate the substantial risk his actions were creating when he should have been aware of it, thus showing criminal negligence. Since either interpretation is reasonable, I would hold that the charge on criminally negligent homicide, properly requested, should have been given so the jury as the finder of fact, could make this decision. *Giles v. State*, 617 S.W.2d 690 (Tex.Cr.App.1981); and *Dillon v. State*, 574 S.W.2d 92 (Tex.Cr.App.1978). The jury, if it believed the version favorable to appellant, could have found that the appellant ought to have been, but was not, aware that his conduct would create a substantial and unjustifiable risk.

Although I recognize that in *Ormsby*, supra, the Court was confronted with a V.T.C.A. Penal Code, Sec. 19.05(a)(2) offense, whereas the appellant was charged with committing a Sec. 19.05(a)(1) offense, nevertheless, I find the facts here are equal to if not superior to those found in *Ormsby*, thus justifying a charge on the lesser included offense of criminally negligent homicide. See also *Campbell v. State*, 614 S.W.2d 443 (Tex.Cr.App.1981); *Branham v. State*, 583 S.W.2d 782 (Tex.Cr.App.1979); *London v. State*, 547 S.W.2d 27 (Tex.Cr.App.1977); *Dockery v. State*, 542 S.W.2d 644 (Tex.Cr.App.1976).

For failure of the trial court to instruct the jury on the lesser included offense of criminally negligent homicide, the conviction should be ordered reversed and the cause remanded.

I will next discuss appellant's complaint, which concerns the taking of his blood when he was unconscious at the hospital. The blood was actually obtained by a nurse, Grace Beck, who was then acting on instructions from Tyler police officers.

The evidence at pre-trial and trial undisputedly shows the only reason a sample of appellant's blood was obtained was because Lieutenant Audy Adams of the Tyler police department, a "shift-commander," "advised" Patrolman Tom Giorgio to obtain a sample of blood from the unconscious appellant. Adams testified that he sought a sample of appellant's blood because "we were still in the investigative area, trying to establish what had happened." Adams never amplified this statement. Other than being "advised" by Adams to obtain a sample of blood from the unconscious appellant, Giorgio gave no other reason or explanation for his actions in instructing Beck to take a sample of appellant's blood.

Giorgio testified that after being advised by Adams to obtain the blood sample, and after obtaining a vial from Officer Sellers, he went to Nurse Beck, and asked her if he could get a sample of appellant's blood. She told him it would be alright. After Beck obtained the sample of blood from appellant's body, and put it in a vial, she turned it over to Giorgio, who turned it over to a Captain Finley of the Tyler police department, who turned it over to a Lieutenant Scott of the Tyler police department, who mailed it to the Department of Public Safety office in Tyler.

Joe Hogan, a Department of Public Safety chemist, testified he made an analysis of the blood, and in his opinion it contained 0.14 per cent alcohol by weight.

I emphasize: at no time before or during the appellant's trial was any reason given for obtaining appellant's blood other than it was obtained because, as Adams put it: "We were still in the investigative area." I also emphasize that at no time did Adams amplify or explain his statement.

The testimony was also undisputed that appellant was never under arrest or restraint from the time he was removed by ambulance from the scene of the collision until he was released from the hospital. Tyler Police Detective Nelson Downing testified he was assigned to investigate the case four or five days later.[5] Exactly one week from the date of the accident, September 9, 1976, after reviewing the case with members of the District Attorney's staff, Downing lodged a charge against appellant. However, it was not until September 15, 1976, when the police were notified that appellant was ready to be released from the hospital that appellant was formally arrested.

Because appellant was not at any time shown to be under arrest by law enforcement officials, the implied consent law, see Art. 6701*l*–5, V.A.C.S., is not applicable to this cause. See *Darland v. State*, 582 S.W.2d 452 (Tex.Cr.App.1979); *Bennett v. State*, 522 S.W.2d 507 (Tex.Cr.App.1975). Although there need not be an actual physical taking into custody of a person in order to have an arrest,[6] I find no evidence in this record which would warrant a finding that appellant's movements were restricted or that he was ever restrained by any law

---

5. Downing's investigation, by the record, consisted of interviewing several witnesses. The "fruits" of his investigation, as far as obtaining admissible evidence in court, were nil. Nearing the conclusion of the prosecutor's direct examination, the trial judge, in part, remarked to the prosecutor:

> Well, thus far, to my knowledge, the entire testimony of Officer Downing has shed absolutely no light on any issue that the Jury is going to have to determine . . . .

6. See Art. 15.22, V.A.C.C.P., for a definition of "arrest." An arrest is complete whenever a person's liberty of movement is restricted or restrained, see *Maldonado v. State*, 528 S.W.2d 234 (Tex.Cr.App.1975), and see also Judge Roberts' pointed remarks in *Stone v. State*, 583 S.W.2d 410 (Tex.Cr.App.1979) (Dissenting Opinion).

enforcement official until he was formally arrested.

I first observe, in addressing appellant's complaint, that the seizing of one's blood is not "testimonial" in nature, and therefore forcing its production is not considered compelled self-incrimination, *as contemplated by the Fifth Amendment* to the United States Constitution, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), although such searches may implicate the due process clause of the Fourteenth Amendment, because such seizures have the potential to humiliate or debase the dignity of the person, thereby "shocking the conscience" of the court. See *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952).

It was formerly the rule in Texas that in the absence of a showing that a specimen of blood was taken with the defendant's consent, testimony of a toxicologist as to his results of an analysis of a specimen of the defendant's blood was inadmissible to prove intoxication of the defendant in a prosecution for driving while intoxicated. See *Trammell v. State*, 162 Tex.Cr.R. 543, 287 S.W.2d 487 (1956), a case where the facts are very similar to those at bar.

Until *Olson v. State*, 484 S.W.2d 756 (Tex.Cr.App.1972), overruled *Trammell*, it appears that the rights guaranteed by Art. I, Sec. 10, of the Texas Constitution,[7] were superior to those guaranteed by the Fifth Amendment to the United States Constitution. The pre-*Olson* requirements for taking of blood from a person in Texas were: (1) it had to be done with the consent of the person whose state of sobriety was questioned, and (2) it had to be taken by competent and trained nurses, doctors, or laboratory technicians.

However, *Trammell*, supra, was laid to rest by *Olson*, supra, when this Court held that "compelling a blood test, if taken under conditions which comport with due

process, does not constitute requiring an accused to 'give evidence against himself.'" Thus, though dicta, it became the law in Texas that the provisions of Art. I, Sec. 10, were applicable only to the self-incrimination privilege and were "a safeguard similar to that contained in the Fifth Amendment," where the obtaining of blood was at issue.

But, the question which was not decided by *Olson* was whether or not the Fourth Amendment to the United States Constitution applied to the taking of an accused's blood. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Also of importance is Art. I, Sec. 9, of the Texas Constitution, which provides:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

However, since *Olson*, supra, was decided, this Court has not hesitated in holding that if the item of evidence is blood, and it was sought only to study it for type or immutable characteristics, a search warrant is necessary before the accused's blood may legally be obtained.

In *Escamilla v. State*, 556 S.W.2d 796 (Tex.Cr.App.1977), this Court expressly ruled that the taking of a defendant's blood is a search and seizure under Texas constitutional law, Art. I, Sec. 9, and to obtain a person's blood without consent, it is necessary to obtain a search warrant. In *Escamilla*, it was expressly pointed out that no

---

7. Art. I, Sec. 10, provides: "... He shall not be compelled to give evidence against himself, ..."

warrant could be obtained for blood, as blood was not one of the items for which a search warrant could issue under then Art. 18.02, V.A.C.C.P. Cf. the recent amendment to the statute, which provides in part that a warrant may be obtained "(10) for property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." There is no need to discuss the applicability of the amendment to this cause, for it is undisputed there was no search warrant sought or obtained by the law enforcement officials involved. Nor do I discuss the issue of "consent," for it is also undisputed that appellant was at all times either unconscious, comatose, or incoherent at the time that the blood was obtained from his body by Nurse Beck. Nor, lastly, do I find it necessary to discuss, for reasons hereinabove stated, whether or not under Texas law there is an exception to the warrant requirement for the taking of blood where "exigent circumstances" exist, such as the taking of blood based upon the fact that alcohol in the blood is by its nature highly evanescent, and disappearing within several hours of ingestion of the alcohol.

I simply do not believe that our forefathers, who enacted the Bill of Rights found in the Texas Constitution, wanted this Court to ever second-guess the reason blood was obtained from the human body. And yet, that is exactly what the majority does today in arriving at its conclusion: "In the present case the exigency of rapidly dissipating alcohol justified the search." Textbook law should never be substituted for the actual and real facts of a case. But, I feel that is what the majority does here, for the facts of the case do not sustain the above conclusion.

*Escamilla*, supra, was diligently and carefully followed by this Court in *Smith v. State*, 557 S.W.2d 299 (Tex.Cr.App.1977), see also *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978). In *Smith*, supra, this Court said: "It would appear that the only exception to the warrant requirement in a search for blood would be that on consent."[8] *Id.* at page 302. This Court also said in Smith:

There can be no exigent circumstances that would dispense with the warrant requirement if the defendant is in custody. A person's blood type remains constant throughout his lifetime. A search for blood cannot be based on the incident to a lawful arrest exception. It is not unlawful to possess blood. The possession of blood would not endanger the arresting officer. It would appear that the only exception to the warrant requirement in a search for blood would be that of consent. *Id.* at 301–02.

The harmless error rule may be applicable to a particular case, even where a warrant is not obtained to search for blood. See *Ferguson v. State*, 573 S.W.2d 516 (Tex.

8. The fact that the appellant was not formally arrested until he was released from the hospital does not preclude him from questioning or contesting the obtaining of blood from his body—a search in its truest form—because I find he had "standing" to object to the admissibility of the evidence going to the taking of the blood and the use of the chemical analysis made of the blood. Texas recognizes the right of an individual to privacy, see *Buchanan v. State*, 471 S.W.2d 401 (Tex.Cr.App.1971), and the United States Supreme Court has recognized that an individual has a constitutionally protected reasonable expectation of privacy, see *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For my comments regarding the doctrine of "standing," see *Goehring v. State*, 627 S.W.2d 159 (1982).

Surely, if an individual has the right of privacy to use a toilet stall, see *Buchanan*, supra, or has the right of reasonable expectation of privacy in a public telephone booth, see *Katz*, supra, the right of privacy and the right of reasonable expectation of privacy carries over to the human body. Thus, appellant has "standing" to contest the search and seizure of his blood by an agent of the police. My remarks in a per curiam opinion, see *Boyd v. State*, 620 S.W.2d 149 (Tex.Cr.App.1981), may appear contradictory to what I say here. However, a close reading of *Boyd* will show that I found that the defendant in that cause, "From a totality of the circumstances, did give a valid consent to the taking of his blood by the highway patrolman." Thus, what I say here and what I said in *Boyd* are compatible.

Cr.App.1978), where it was again recognized that "if the defendant is in custody, either a warrant must be obtained or the defendant must consent to the taking of his blood." However, in *Ferguson* the Court found that the wrongful admission into evidence of the defendant's blood was cured because of the overwhelming evidence of the defendant's guilt.

I also pretermit for another day what warrantless "minor intrusions [if any] into an individual's body under stringently limited conditions" may take place. *Schmerber v. California*, supra, 86 S.Ct. at 1836.

I find and conclude from the facts of this cause that the taking of appellant's blood, without warrant or consent, was unlawful. I arrive at this conclusion based on the very simple fact that the evidence in this record is not sufficient to clearly establish why appellant's blood was sought by Adams. The only testimony by Adams or Giorgio pertaining to the taking of appellant's blood was Adams' statement, "We were still in the investigative area." Although Beck, who took the blood sample, indirectly indicated she expected it was being taken to test for alcoholic content, and Patrolman Sellers stated the type of vial used in taking the sample was used in blood tests for alcohol, this testimony is not conclusive that such was indeed the intent of Adams or Giorgio. For all I can tell from this record, Adams' "investigative area" may have been far removed from the accident in which appellant was involved.

I find it interesting that the State in her trial court brief, filed [just] over three months after *Ferguson*, supra, was decided, neither cites nor discusses *Escamilla, Smith* or *Ferguson*, supra. This perhaps is understandable in light of the facts of the case. The State's reliance on broad general statements found in *Olson*, supra, and *Schmerber*, supra, to sustain the search and seizure of appellant's blood, should be rejected.[9]

For the additional and foregoing reasons, I find that the learned trial court committed reversible error by admitting into evidence the seizure of appellant's blood, as under these facts the search and seizure of appellant's blood were not authorized by Art. I, Sec. 9 of the Texas Constitution. The results of the blood test were erroneously admitted.

To the majority's failure to order reversal, I respectfully dissent.

---

9. The State in her brief acknowledges, and does not question the fact appellant was unconscious when blood was taken from his body, nor does the State dispute the fact that appellant did not consent to the taking of his blood. However, in nonchalant fashion, the State argues: "Neither, however, was he able to deny his consent. There is no testimony in the record that the Defendant at any time resisted the taking of the blood sample. There is no evidence that he was even aware that the blood sample was being taken, or the purpose for which the blood was to be used." These comments border on being tongue in cheek, in light of the facts and well known and unquestioned principles of law that are set forth in *Ferguson*, supra. "In any case in which consent is at issue, the burden is upon the State to show the consent was freely and voluntarily given ... The prosecution must show the consent given was positive and unequivocal, and there must not be duress or coercion, actual or implied ... The burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority ..." *Id.* at page 520. How a person may be unconscious and consent, or be unconscious and aware that something is occurring is not explained by the State.