# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00402-CR

**Harley Allen Belk, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT OF RUNNELS COUNTY
### NO. 24,080, HONORABLE MARILYN EGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Harley Allen Belk was involved in a one-vehicle rollover accident on a farm-to-market road north of Ballinger. Belk was transported by EMS to a hospital, where he was arrested for DWI and had his blood drawn for analysis. Belk was charged by information with the misdemeanor offense of driving while intoxicated, subsequent offense. *See* Tex. Penal Code Ann. § 49.04 (West 2003), § 49.09(b) (West Supp. 2009). Following the denial of his motion to suppress evidence of his intoxication, Belk pleaded nolo contendere. The trial court then found Belk guilty of the offense as charged and assessed punishment at confinement in county jail for one year and a $1,000 fine. However, the trial court suspended imposition of the confinement and placed Belk on community supervision for a period of one year. This appeal followed. In two issues on appeal, Belk asserts that the trial court abused its discretion in denying his motion to suppress because,

according to Belk, (1) his warrantless arrest was not supported by probable cause and (2) his consent to have his blood drawn for testing was involuntary. We will affirm the judgment.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). The trial court is given almost complete deference in its determination of historical facts, especially if those are based on an assessment of credibility and demeanor. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). The same deference is afforded the trial court with respect to its rulings on application of the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006). However, for mixed questions of law and fact that do not fall within that category, a reviewing court conducts a de novo review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).

The trial judge is the exclusive fact-finder at the suppression hearing. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). When the trial court does not make express findings of fact, an appellate court must view the evidence in the light most favorable to the trial court's ruling, assuming that it made any implicit findings of fact that are supported by the record. *Id*. An appellate court will sustain the trial court's decision if it concludes that the decision is correct on any theory of law applicable to the case. *Id*. at 855-56.

**ANALYSIS**

**Probable cause to arrest**

In his first issue, Belk asserts that his warrantless arrest for DWI was not supported by probable cause. Probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Amador*, 275 S.W.3d at 878. "A finding of probable cause requires 'more than bare suspicion' but 'less than . . . would justify . . . conviction.'" *Amador*, 275 S.W.3d at 878 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

In this case, the warrantless arrest was made by DPS Officer Michael Gray, who had investigated the accident. Gray, who was the State's sole witness at the suppression hearing, testified that when he had arrived at the location of the accident, he observed a white Dodge pickup truck laying on its passenger side. Gray also observed Belk inside the vehicle being attended to by EMS personnel. According to Gray, Belk "appeared to be sleeping in the truck. He was not conscious." Meanwhile, EMS personnel "were trying to get him out, figure out a way to get him out of the vehicle" and "trying to talk to him." Gray recalled, "He would come to temporarily, and then he would either go out of consciousness or go to sleep. I do not know." Belk was "finally extracted

3

from the vehicle" and transported to the hospital. Gray testified that he did not have any interaction with Belk at the accident scene.

Gray remained at the scene to complete the accident investigation. After the vehicle had been removed from the ditch, Gray observed a gin bottle nearby. When asked how far the gin bottle was from where the pickup had been, Gray testified, "I believe it might possibly have been under the pickup, if not right there close by." However, Gray admitted that he had no other facts connecting Belk to the bottle or any information as to whether the bottle even contained an alcoholic substance.

After completing the investigation at the scene, Gray went to the hospital to interview Belk. Gray testified that Belk "appeared to be very disoriented" during the interview. Gray elaborated:

> There was a strong odor of an alcoholic beverage inside the room that Mr. Belk was in. His speech was slurred. His eyes were bloodshot. Very bloodshot, very glassy. During my initial interview, during questioning, he appeared to have a hard time comprehending the questions that I was asking him and giving answers in response to my questions.

Also, according to Gray, Belk "did not remember anything about the wreck." In Gray's opinion, Belk "appeared to be very intoxicated." When asked what it was about Belk's appearance that led him to believe this, Gray answered, "It was a strong odor of alcohol that was coming from his person, his slurred speech, his inability to answer simple questions. He seemed very confused, seemed like he did not know exactly what had happened to him." Gray did not notice any visible injuries on Belk. Gray recalled that, when he asked Belk if he had been drinking, Belk answered,

4

"Not that I know of." At that point, Gray testified, he placed Belk under arrest for DWI. Gray explained that he did not perform any field sobriety tests because Belk "was on a hospital bed."

The defense's theory at the suppression hearing was that the above facts which Gray had interpreted as being consistent with intoxication were actually symptoms of Belk having suffered head trauma during the accident. In his cross-examination of Gray, defense counsel elicited some testimony to support this theory. Gray agreed that it is not uncommon for people involved in rollover accidents to suffer concussions and that, when someone suffers from a concussion, that person may act sleepy, dazed, confused, and be generally nonresponsive. Gray also agreed that such injuries can cause people to lose consciousness, as Belk appeared to do at the scene. However, Gray emphasized that he was not a doctor or nurse and thus was unable to determine whether Belk had suffered from a concussion or any other internal injury. Gray maintained that Belk had not appeared visibly injured in any way. Additionally, Gray testified that, "later on in the evening," doctors had informed Gray that Belk "was free to go, that he was not injured" and that Belk had been released from the hospital and into Gray's custody that night.

Two nurses who had treated Belk that night also testified for the defense. Kay Schumacher testified that, when Belk arrived at the hospital, "he was pretty much out of it," "snoring," "confused," and that his words were not intelligible. When asked if she was concerned that Belk might have suffered a head injury that night, Schumacher testified, "It's always a concern when you have a person who has been in a motor vehicle crash." She also agreed that those concerns were heightened when the person appears disoriented and confused. Sherry Gonzalez, the nurse who had taken blood from Belk, was asked if she agreed with Gray's and Schumacher's statements

5

that Belk appeared confused at the hospital. Gonzalez answered that she had not observed Belk "long enough to comment."

Belk also testified for the limited purpose of the suppression hearing. Belk testified that he did not recall being treated by EMS personnel at the scene of the accident and that he recalled "very little" of what had happened at the hospital. Belk also testified that he did not remember receiving any blows to the head during the accident. According to Belk, he had brain surgery in either 1990 or 1991 and still suffered some side effects from the surgery, specifically sensitivity to hits to his head. Belk, who also testified that he used hearing aids and that he was not wearing them on the night of the accident, claimed that he did not recall speaking to Gray and did not understand or know what was happening at the hospital. On cross-examination, Belk admitted that he had not been treated for any injuries he had allegedly sustained in the accident.

On this record, we cannot conclude that the trial court abused its discretion in finding that Gray had probable cause to arrest Belk for DWI. At the time of arrest, the facts and circumstances within Gray's knowledge and of which he had reasonably trustworthy information included that there was a strong odor of alcohol coming from Belk's person and permeating the emergency room in which Belk had been taken following the accident. These facts, furthermore, inform the inferences that could be drawn from the facts that Belk had been involved in a one-vehicle rollover accident; that a gin bottle was found near the scene of the accident; that Belk had bloodshot and glassy eyes; that Belk's speech was slurred; that Belk did not appear to be injured; that Belk appeared to be very disoriented; that Belk did not remember anything about the wreck; and that, during Gray's questioning, Belk "appeared to have a hard time comprehending the questions that

6

I was asking him and giving answers in response to my questions." Considering the totality of the circumstances facing the arresting officer, the record supports a finding by the trial court that the facts and circumstances "were sufficient to warrant a prudent man in believing that the person arrested had committed the offense of driving while intoxicated."

In contending otherwise, Belk relies on this Court's opinion in *State v. Williams*, 814 S.W.2d 256 (Tex. App.—Austin 1991), *aff'd*, 832 S.W.2d 52 (Tex. Crim. App. 1992). In *Williams*, the defendant, who had been involved in a one-car accident, was taken to the hospital and later arrested for the offense of driving while intoxicated. *Id*. at 258. As in this case, the arresting officer in *Williams* went to the hospital after investigating the accident scene and observed that the defendant had an odor of alcohol on his breath, bloodshot eyes, and slurred speech. *Id*. Additionally, the officer performed a horizontal gaze nystagmus test and noticed that the defendant's eyes "jerked almost immediately." *Id*. Despite these facts, the trial court granted the defendant's motion to suppress, noting prior to its ruling that "where there is a severe accident, red eyes and slurred speech may be due to the consumption of alcohol or to the accident." *Id*. at 258-59. This Court affirmed the trial court's ruling. *Id*. at 261. Seizing upon the above remark by *the trial court* (not by, as Belk suggests, this Court), Belk contends that the facts of this case demand the same result. We disagree.

The procedural posture of *Williams* was different than the case before us. The trial court in *Williams* granted the defendant's motion to suppress, and this Court concluded that it was not an abuse of discretion to do so. In this case, Belk is asking us to conclude that the trial court's denial of the motion to suppress was an abuse of discretion. On this record, as we

7

have already explained, we cannot do so. In *Williams*, the trial court did not give much weight to the opinions and observations of the arresting officer.[1] *See id*. at 260. In contrast, the trial court in this case, by its ruling, implicitly did. In each case, the trial court, acting as the fact-finder at the suppression hearing, reasonably exercised its discretion in evaluating the weight and credibility of the evidence before it. *See Nottingham v. State*, 908 S.W.2d 585, 589 (Tex. App.—Austin 1995, no pet.) ("[O]ur holding in *Williams* that the trial court did not abuse its discretion in finding an absence of probable cause does not necessarily mean that another trial court, given similar facts, could not reasonably reach the opposite conclusion.").[2]

Also, we observe that there were additional facts in this case supporting the officer's determination that Belk had committed the offense of driving while intoxicated that were not present in *Williams*, including the gin bottle found near the scene of the accident, the smell of alcohol "inside the [emergency] room" (not just on the defendant's breath), and the conversation between Gray and Belk, in which Belk "appeared very disoriented," was unable "to answer simple questions" and

[1] The trial court in *Williams* commented that it had found that the arresting officer was "real ambivalent as to whether [Williams was] under arrest." *State v. Williams*, 814 S.W.2d 256, 258 (Tex. App.—Austin 1991), *aff'd*, 832 S.W.2d 52 (Tex. Crim. App. 1992).

[2] Belk also cites this Court's unpublished opinion in *Tapper v. State*, No. 03-06-00248-CR, 2007 Tex. App. LEXIS 6801 (Tex. App.—Austin Aug. 23, 2007, no pet.) (mem. op., not designated for publication). In that case, the arresting officer testified that the only reasons he believed the defendant had committed the offense of driving while intoxicated were "the facts that the appellant was involved in a single-car collision, smelled like alcohol, and dropped his wallet." *Id*. at *15. Concluding that these factors were not sufficient to establish probable cause to arrest, this Court reversed the trial court's denial of the defendant's motion to suppress. *Id*. at *16-18. *Tapper* is factually distinguishable, however, because in this case, there were additional facts supporting the probable-cause determination, including Belk's bloodshot eyes, slurred speech, and "confused" and disoriented behavior and responses to Gray's questions.

"seemed like he did not know exactly what had happened to him." Also, when Gray asked Belk if he had been drinking, rather than denying that he had been drinking, Belk answered, "Not that I know of." While Belk contends that his "confused" behavior and responses were just as consistent with a head injury as with intoxication, the trial court would not have abused its discretion in concluding otherwise. Gray testified that Belk did not appear injured at the time of his arrest, and Belk offered no conclusive evidence establishing that he had in fact been injured. On the contrary, Belk testified that he did not remember receiving any blows to the head during the accident, and Gray testified that the doctors had informed him (albeit after the arrest) that Belk was "free to go and was not injured."[3]

We overrule Belk's first issue.

**Consent to draw blood**

After Gray had arrested Belk, Gray requested a sample of Belk's blood for analysis. Belk's blood was subsequently drawn and tested. In his second issue, Belk asserts that he did not voluntarily consent to have his blood drawn.

The withdrawal of blood from a person is considered a search and seizure under both federal and Texas law. *See Schmerber v. California*, 384 U.S. 757, 767 (1966); *Aliff v. State*, 627 S.W.2d 166, 169 (Tex. Crim. App. 1982). Both the United States and Texas Constitutions protect individuals against "unreasonable" searches and seizures. *See* U.S. Const. amend. IV;

---

[3] While this post-arrest information would not have factored into the officer's probable-cause determination, it was relevant to the trial court's assessment of the weight and credibility of the officer's testimony that Belk did not appear injured at the time of the arrest.

Tex. Const. art. I, § 9. A search and seizure "made after voluntary consent is not unreasonable." *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). "If voluntariness is challenged at trial, 'the State must prove the voluntariness of a consent by clear and convincing evidence.'" *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006) (quoting *Ibarra v. State*, 953 S.W.2d 242, 245 (Tex. Crim. App. 1997)). "A trial judge 'must look at the totality of the circumstances surrounding the statement of consent in order to determine whether that consent was given voluntarily.'" *Id.* (quoting *Reasor*, 12 S.W.3d at 818).

Section 724.011 of the transportation code, known as the implied consent statute, provides, "If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place . . . while intoxicated . . . the person is deemed to have consented . . . to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance." Tex. Transp. Code Ann. § 724.011 (West 1999). This provision creates a statutory presumption of consent. *Rodriguez v. State*, 631 S.W.2d 515, 516 (Tex. Crim. App. 1982); *State v. Amaya*, 221 S.W.3d 797, 800 (Tex. App.—Dallas 2007, pet. ref'd). However, that presumption may be rebutted by evidence tending to show that consent was not voluntarily given. *Amaya*, 221 S.W.3d at 801. An arrested person's decision to submit to a breath or blood test must be his own and must be freely made with a correct understanding of the statutory consequences of refusal. *Erdman v. State*, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993); *see* Tex. Transp. Code Ann. § 724.015 (West Supp. 2009) (listing statutory consequences of refusal that officer must inform person of orally and in writing before

10

requesting consent). To be voluntary and thus consistent with the statutory scheme, the decision to provide a sample must not result from physical or psychological pressures brought to bear by law enforcement officials. *Erdman*, 861 S.W.2d at 893; *Thomas v. State*, 723 S.W.2d 696, 704-05 (Tex. Crim. App. 1986); *Sandoval v. State*, 17 S.W.3d 792, 795 (Tex. App.—Austin 2000, pet. ref'd). Consent is also not voluntary if it is induced by an officer's misstatement of the consequences flowing from a refusal to give a specimen. *See Erdman*, 861 S.W.2d at 894.

In this case, Gray testified that he "gave Mr. Belk a copy of the statutory warning for him to read while I read it to him," and Belk does not contend that Gray misstated or improperly elaborated upon the statutory consequences of refusal in any way. Instead, Belk asserts that his consent was involuntary because of his "confused" state of mind at the hospital and because, according to Belk, Gray "withheld" requested medical attention from Belk until obtaining the blood specimen.

As support for his contention that he did not understand what was being asked of him, Belk relies on an audio recording of Gray's interview with and arrest of Belk at the hospital that was admitted into evidence at the suppression hearing. We have listened to a copy of the recording. In it, Gray can be heard reading Belk the statutory warning and asking Belk, "Will you give a specimen of your blood?" Belk can be heard responding, "I will." At no point in the recording is Belk heard withdrawing that consent. Belk can be heard asking Gray on at least two occasions, "Why are we doing this?"[4] However, the trial court would not have abused its discretion in finding that these

---

[4] We note that it is difficult to understand much of what Belk is saying in the recording because Belk's speech was slurred throughout.

11

questions did not render Belk's consent involuntary. The context of Bell's questions is unclear from the audio recording, and Belk provided no testimony to clarify what he meant. Belk's vague questions, the trial court could have found, could have been referring to any number of things incidental or even wholly unrelated to the blood draw. The trial court would not have abused its discretion in finding that, whatever the questions concerned, they did not indicate that Belk lacked awareness or understanding of the implications of the blood draw or the statutory consequences of refusing to provide a specimen. On the contrary, when asked if Belk gave any indication that he did not understand the statutory warnings that he read to him, Gray testified, "No, sir." Gray also testified that Belk did not ask Gray to explain anything to him regarding the contents of the form.

As for Belk's contention that Gray withheld requested medical treatment, Gray testified, "I never withheld medical attention [from] Mr. Belk." Belk points to two occasions in the recording in which he asks Gray, "Would you check me right now?" and "Would you check me right now and see if I'm . . . ." Gray replies, "No, I need a specimen of your blood and that will be checking you right now," and, "After I get your blood." Again, it is difficult to discern from the audio recording to what Belk was referring, and he did not clarify what he meant during his testimony. Gray testified that when Belk asked to be "checked," Gray "didn't take it as [if] he was asking for medical attention." Instead, Gray "thought he was asking for me to check his blood alcohol concentration right now." Gray added, "When Mr. Belk asked me if I would check him it never once entered my mind that he was asking for a doctor." The trial court would not have abused its discretion in crediting Gray's testimony and finding that, rather than requesting medical treatment, Belk was asking that his blood alcohol level be "checked right now," especially

12

considering that Belk's questions closely followed Gray's request for a blood specimen.  On this record, we cannot conclude that the trial court abused its discretion in finding from the totality of the circumstances that Belk's consent was voluntarily given.

We overrule Belk's second issue.

## CONCLUSION

We affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:   August 11, 2010

Do Not Publish

13