# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00721-CR

**State of Texas, Appellant**

**v.**

**Michael Mosely, Appellee**

## FROM COUNTY COURT AT LAW NO. 8 OF TRAVIS COUNTY
## NO. C-1-CR-08-400106, HONORABLE CARLOS HUMBERTO BARRERA, JUDGE PRESIDING

## O P I N I O N

The State appeals an order granting Michael Mosely's pre-trial motion to suppress evidence. *See* Tex. Crim. Proc. Code Ann. art. 44.01(a)(5) (West Supp. 2010). Mosely was involved in a traffic accident and subsequently had his blood-alcohol content ("BAC") tested via blood-draw. Based on the results of the test, the State charged Mosely with driving while intoxicated ("DWI"). *See* Tex. Penal Code Ann. § 49.04 (West 2003). Mosely moved to suppress the results of the test on the grounds that he did not consent to the test and was not subject to an involuntary test. *See* Tex. Trans. Code Ann. § 724.012(b) (West Supp. 2010) (listing statutory requirements for involuntary blood draw);[1] *Aliff v. State*, 627 S.W.2d 166, 169 (Tex. Crim. App. 1982) (listing constitutional

---

[1] This statute has been revised since the events in question. *See* Act of June 19, 2009, 81st Leg., R.S., ch. 1348, § 18, 2009 Tex. Gen. Laws 4267-68. Throughout this opinion we refer to the version of the statute that was in effect when Mosely had his blood drawn. *See* Act of June 20, 2003, 78th Leg., R.S., ch. 422, § 1, 2003 Tex. Gen. Laws 1669-70.

requirements for involuntary blood draw). After a hearing, the trial court granted Mosely's motion. The State argues that granting the motion was error because Mosely consented to the blood draw and in any event his consent was not required. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:55 a.m. on July 12, 2006, Mosely was driving his truck east on Highway 71 in western Travis County. He had five passengers in his truck, all of whom had been drinking throughout the day. Although Mosely was the "designated driver," he admitted during the suppression hearing that he had also consumed several drinks over the course of the day.

As Mosely turned left onto Bob Wire Road, a motorcycle struck the right rear portion of his truck. Its rider, who had been heading west, was thrown over the bed of the truck and came to a stop in the middle of Highway 71. Mosely stopped his truck, and he and his passengers got out. They attempted to warn approaching vehicles of the motorcyclist's presence on the highway, but one vehicle failed to slow down and ran over the motorcyclist. It dragged the motorcyclist approximately thirty feet before he became dislodged, at which point the vehicle sped away. Someone in Mosely's group called emergency medical services.

At approximately 2:00 a.m., state trooper Michael Campos arrived on the scene. He testified at the suppression hearing that by the time he arrived, emergency medical services had already declared the motorcyclist dead. Trooper Campos proceeded to interview Mosely and his passengers. Campos testified that Mosely told him he had not seen the motorcycle approaching. Mosely's passengers also told Campos they had not seen the motorcycle approaching. Mosely and his passengers maintained that the motorcycle's headlight had not been on. Tests conducted on the

2

motorcycle after the accident were inconclusive on that matter, though tests on its deceased rider revealed that his BAC was .14 at the time of the accident, well above the legal threshold for intoxication. *See* Tex. Penal Code Ann. § 49.01(1)(B) (West 2003).

Trooper Campos testified that during his on-scene interaction with Mosely, Mosely exhibited a "noticeable, probably moderate" smell of alcohol and bloodshot eyes but did not appear to have trouble speaking or maintaining his balance. Campos testified that Mosely told him he had had "a couple of drinks," though Mosely later testified and denied Campos's allegation. Campos testified that while on the scene he believed Mosely was "possibly" intoxicated but did not form a definite opinion on the matter. Campos did not ask Mosely to perform any field sobriety tests.

Campos testified that based on the circumstances of the accident, he believed that Mosely was subject to a mandatory blood draw to test his BAC. He testified that he

> explained to [Mosely] what the law was and that he had two choices, one, that he comply voluntarily to go . . . to the nearest medical facility for a blood draw, or that he would be placed in custody and transported against his will and . . . a blood draw would have been taken based on the law at that time.

Campos clarified: "I didn't order him [to have his blood drawn] or anything. I asked him." Campos testified that after he explained his understanding of the law, Mosely "consented" to a blood draw. Subsequently, Mosely got in the patrol car of state trooper Jymie Ha and rode with Ha to a nearby emergency room. At no point did Campos or Ha handcuff Mosely or tell him he was under arrest.

Trooper Ha testified that Mosely rode in the front seat of his patrol car on the way to the emergency room. The trip took somewhere between twelve and fifteen minutes, during which time Ha smelled alcohol on Mosely but noticed no other signs of intoxication.

3

Mosely's testimony about the subsequent events conflicted with Ha's. Mosely testified that as he and Ha arrived at the emergency room, he told Ha that he "felt very uncomfortable about the situation, that [he] wasn't sure what [his] rights were[,] and asked if it would be okay if [he] contacted [his] attorney prior to going into the hospital." Mosely testified that Ha responded by saying, "if [Mosely] didn't do anything wrong, [he] didn't have anything to worry about." Ha testified that he did not recall this exchange. He also testified that he never told Mosely "anything along [the lines]" of "if you don't give [blood voluntarily], I'm going to have to arrest you."

Mosely testified that he and Ha entered the emergency room together, and Ha approached a nurse about needing to have Mosely's blood drawn. Mosely testified that the nurse responded by asking whether Ha had Mosely's consent to the blood draw, and Ha initially did not respond. Mosely testified that the nurse followed up by saying, "[w]ithout the patient's consent, we can't do a blood alcohol profile unless he's under arrest. Is he under arrest?" Mosely testified that Ha "hesitated for a moment and kind of shrugged and said, Yes, he's under arrest." Ha testified that he did not recall this exchange and that he believed Mosely gave blood voluntarily. He also testified that he believed Mosely was not under arrest, that he would have lacked probable cause to place Mosely under arrest, and that he never filled out the paperwork that is required when a suspect's blood is drawn involuntarily pursuant to an arrest.

Mosely testified that after he heard Ha tell the nurse he was under arrest, he asked Ha why he was under arrest and was told that "when there was an accident involving a fatality that it was mandatory that they conduct a blood alcohol profile." Mosely testified that after this exchange he basically had no further communication with Ha.

4

Mark White, the nurse who drew Mosely's blood, testified that he did not remember much about the events in question. He did not remember Mosely objecting to the blood draw, nor did he remember "the word 'voluntary' being said" at any point.

Jennifer Hall, who was one of Mosely's passengers on the night of the accident, testified that she never saw any indication that Mosely was under arrest. She also testified, however, that after Mosely talked to Trooper Campos, he told her that he expected to be arrested because he was going to refuse to have his blood drawn.

Mosely testified that over the course of the evening in question he was never "specifically asked" whether he would voluntarily submit to the taking of a blood sample. He also testified that after hearing Ha tell the nurse he was under arrest, he felt he would be "resisting arrest" if he expressed any objection to having his blood drawn. Thus, Mosely testified, he felt he had no choice but to submit to the blood draw.

Mosely testified that he was never asked to sign a blood-draw consent form, nor was he read anything about the consequences of refusing a blood draw. He testified that he would not have signed a consent form if he had been presented one.

After Mosely's blood was drawn, Ha returned Mosely to the scene of the accident and let him go. Roughly six weeks later, the State obtained the results of Mosely's blood test. They showed that Mosely's BAC was .19 at the time of the draw; accordingly, the State charged Mosely with driving while intoxicated. *See id*. § 49.04.

Before trial, Mosely moved to suppress the results of his blood test on the grounds that he neither consented to the test nor met the criteria for having his blood drawn involuntarily. The trial

5

court held a hearing on the motion, subsequently granted the motion, and issued written findings of fact and conclusions of law. The findings of fact included the following:

- "Moseley [sic] caused the accident by having failed to yield the right of way, although there was a question, but no clear evidence, as to whether the motorcyclist . . . had his head lamp on."

- "D.P.S. Trooper Michael Campos . . . found Moseley [sic] to have a noticeable odor of alcohol coming from his breath, to having [sic] bloodshot eyes, and admitting to having had 'a couple of (alcoholic) drinks.'"

- "Trooper Campos explained to Moseley [sic] that he could voluntarily submit to a blood draw or that he would be taken into custody and have a mandatory blood draw taken."

- "Moseley [sic] believed he was under arrest and expected to be jailed at the time."

- "When asked by the medical attendant at the hospital, Trooper Ha stated that Moseley [sic] was under arrest in order to have the blood drawn."

- "Moseley [sic] acquiesced, but did [not] volunteer, to give his blood."

The trial court's conclusions of law included the following:

- "Trooper Campos had reasonable suspicion to detain Mr. Moseley [sic] for investigation of intoxication."

- "At the time Mr. Moseley's [sic] blood was drawn, he was not under arrest."

- "Mr. Moseley [sic] did not voluntarily agree to have his blood drawn."

- "Mr. Moseley's [sic] acquiescence was not voluntary but the result of coercion by Troopers Campos and Ha informing Mr. Moseley [sic] that he would be arrested and was under arrest to effect the blood draw, respectively."

The State appeals.

**STANDARD OF REVIEW**

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). We defer almost completely to the trial court's determinations of historical fact, especially if they are based on assessments of witness credibility and demeanor. *Crain*, 315 S.W.3d at 48. We afford the same deference to trial court rulings on the application of law to pure questions of fact, and to mixed questions of law and fact, when they depend on evaluations of witness credibility and demeanor. *Id*. For mixed questions of law and fact that do not depend on evaluations of witness credibility and demeanor, however, we review the trial court's rulings de novo. *Id*.

**DISCUSSION**

The State argues that Mosely was constitutionally and statutorily subject to an involuntary blood draw, so his purported failure to consent was irrelevant. Alternatively, the State argues that Mosely "volunteered" to give blood and was "uncoerced" because he gave blood after Campos gave him "a true statement of the law and circumstances regarding a mandatory blood draw." We will examine these arguments in turn.

***Whether an Involuntary Blood Draw Was Constitutionally Permissible***

Generally speaking, drawing blood from a suspect is a search and seizure within the scope of the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas

Constitution. *See Schmerber v. California*, 384 U.S. 757, 767 (1966); *Aliff*, 627 S.W.2d at 169. Searches and seizures are permissible if they are justified in the circumstances and made in a proper manner. *See Schmerber*, 384 U.S. at 768. Thus, a warrantless seizure of a blood sample can be constitutionally permissible if officers have probable cause to arrest a suspect, exigent circumstances exist, and a reasonable method of extraction is available. *Id*. at 767-68; *see Aliff*, 627 S.W.2d at 169-70.

The State argues that all of the constitutional criteria for an involuntary blood draw were met here. It argues, in other words, that Trooper Campos had probable cause to arrest Mosely for DWI, that exigent circumstances existed (namely, Mosely's BAC would decline over time and therefore needed to be tested quickly), and that a reasonable method of extraction (blood draw by an emergency-room nurse) was available. Mosely argues, in contrast, that not all of the constitutional criteria for an involuntary blood draw were met because Campos lacked probable cause to arrest him for DWI.

"'Probable cause' for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). A finding of probable cause requires more than bare suspicion but less than would justify conviction. *Id*. If a defendant establishes that he was arrested without a warrant, the State bears the burden of proving that probable cause existed to justify the arrest. *See id*. Whether probable cause existed is an objective inquiry that requires consideration of the totality of the circumstances

8

facing the arresting officer. *See id*. Thus, while deferring to the facts found by the trial court, we review de novo whether the evidence establishes that probable cause existed. *See Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

The trial court issued a few findings of fact that bear on whether Campos had probable cause to arrest Mosely for DWI. The court found that when Campos approached Mosely on the night in question, Mosely had a noticeable odor of alcohol coming from his breath, had bloodshot eyes, and admitted to having a couple of alcoholic drinks. In addition, the court found that Mosely caused a traffic accident by failing to yield the right-of-way (though the court also found that "there was a question, but no clear evidence," as to whether the motorcyclist who collided with Mosely had his headlight on). The record contains no other evidence that would support a finding that Mosely exhibited signs of intoxication on the night in question. The question we must answer is whether this record so thoroughly satisfies the State's burden of establishing that Campos had probable cause to arrest Mosely for DWI that the trial court's ruling to the contrary was an abuse of discretion. *See id*.

We hold that it does not. Intoxication is defined as "not having the normal use of mental or physical faculties." *See* Tex. Penal Code Ann. § 49.01(2)(A) (West 2011). Thus, to establish that Campos had probable cause to arrest Mosely for DWI, the State needed to present evidence that Mosely lacked the normal use of his mental or physical faculties. *See Kirsch v. State*, 276 S.W.3d 579, 584-85 (Tex. App.—Houston [1st Dist.] 2008), *aff'd*, 306 S.W.3d 738 (Tex. Crim. App. 2009). It did not do so. Neither Campos nor Ha performed field sobriety tests on Mosely, and Campos testified that he did not observe Mosely slur his speech, have trouble maintaining his balance, or do anything else to suggest that he was physically or mentally impaired. Indeed, both troopers

9

testified that they did not form an opinion as to whether Mosely was intoxicated. While the facts that Mosely was involved in an accident, smelled of alcohol, had bloodshot eyes, and admitted to drinking are certainly consistent with intoxication, they do not establish that Mosely had lost the normal use of his faculties.

Because the State failed to establish that Mosely had lost the normal use of his faculties, it failed to carry its burden of establishing that the troopers had probable cause to arrest Mosely. Thus, the troopers could not constitutionally draw Mosely's blood without Mosely's consent. *Schmerber*, 384 U.S. at 768; *Aliff*, 627 S.W.2d at 169-70. We turn to consider whether the troopers had statutory authority to draw Mosely's blood without Mosely's consent.

***Whether an Involuntary Blood Draw Was Statutorily Permissible***

When the events in question occurred, transportation code section 724.012(b)(1) provided in pertinent part:

> A peace officer shall require the taking of a specimen of the person's breath or blood if:
>
> 1) the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;
>
> 2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;
>
> 3) at the time of the arrest the officer reasonably believes that as a direct result of the accident:
>
>> (A) any individual has died or will die; or
>>
>> (B) an individual other than the person has suffered serious bodily injury; and

> 4) the person refuses the officer's request to submit to the taking of a specimen voluntarily.

Tex. Transp. Code § 724.012(b). The State argues that all of these criteria were met here, so under the statute Mosely's blood could be drawn without his consent. We disagree for two reasons. First, a statute cannot authorize what the Constitution forbids. *See* U.S. Const. art. VI, cl. 2. ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). As explained above, under the circumstances established by the evidence, the Constitution forbade an involuntary blood draw here; thus, a statute could not authorize one. *See State v. Johnston*, 336 S.W.3d 649, 661 (Tex. Crim. App. 2011) (transportation code chapter 724 does not dictate what is constitutionally permissible); *Knisely v. State*, 81 S.W.3d 478, 483 (Tex. App.—Dallas 2002, pet. ref'd) (statutory requirements for blood sampling supplement, not reduce, constitutional requirements).

Second, by its own terms, section 724.012(b) applies only when an officer arrests a suspect, *see* Tex. Transp. Code § 724.012(b), and an arrest is legal only if supported by probable cause. *Amador*, 275 S.W.3d at 878. It follows that application of section 724.012(b) is legal only if it involves an arrest that is supported by probable cause. *See Knisely*, 81 S.W.3d at 483. As explained above, the State failed to carry its burden of establishing that troopers Campos and Ha had probable cause to arrest Mosely.[2] Thus, the State failed to establish that the troopers could legally

---

[2] Notably, troopers Campos and Ha both testified that they never developed probable cause to arrest Mosely.

11

arrest Mosely, which means in turn that the State failed to establish that the troopers could legally force Mosely to have his blood drawn pursuant to section 724.012(b). It follows that the trial court did not abuse its discretion by holding that Mosely was not statutorily subject to an involuntary blood draw. We turn, finally, to consider whether Mosely consented to a blood draw.

### *Whether Mosely Consented to a Blood Draw*

The State argues that the trial court erred by concluding Mosely "did not voluntarily agree to have his blood drawn." We review the trial court's conclusion for an abuse of discretion. *Crain*, 315 S.W.3d at 48; *see also Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007) ("Typically, whether consent is voluntary turns on questions of fact and is determined from the totality of the circumstances. For that reason, a finding of voluntary consent is reviewed only for an abuse of discretion.") (citations omitted).

As noted above, sampling a suspect's blood is a form of search and seizure under both the United States and Texas Constitutions. *See Schmerber*, 384 U.S. at 767; *Aliff*, 627 S.W.2d at 169. Thus, sampling a suspect's blood without a warrant or probable cause is constitutionally permissible only if the suspect consents. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). The Texas Constitution requires the State to show by clear and convincing evidence that consent was freely given. *Carmouche*, 10 S.W.3d at 331. To be valid, consent must be positive and unequivocal and may not be coerced. *Id*.

The State argues that Mosely was not "coerced" into giving blood because he gave blood after Trooper Campos correctly explained to him the law regarding blood draws. As the trial

12

court found, Campos "explained to Mosely that he could voluntarily submit to a blood draw or that he would be taken into custody and have a mandatory blood draw taken." On the record before us, this explanation of the law was incorrect; as detailed above, the State failed to establish that Campos had probable cause to arrest Mosely at the time he made this statement. Thus, the State failed to establish that Campos could legally "take[] [Mosely] into custody" for a mandatory blood draw. It follows that Campos's explanation of the law could not yield voluntary consent. *See Erdman v. State*, 861 S.W.2d 890, 894 n.3 (Tex. Crim. App. 1993) ("If a driver's consent is induced by an officer's misstatement of the consequences flowing from a refusal to take the test, the consent is not voluntary.") (quoting *State v. Sells*, 798 S.W.2d 865, 867 (Tex. App.—Austin 1990, no pet.)).

Apart from Campos's misstatement of the law, Mosely testified he was "never specifically asked" whether he would voluntarily submit to a blood test. He also testified that when he arrived at the hospital with Ha, he told Ha that he "felt very uncomfortable about the situation, that [he] wasn't sure what [his] rights were[,] and asked if it would be okay if [he] contacted [his] attorney prior to going into the hospital." Finally, Mosely testified that he found it "shocking" to hear Ha testify that he gave blood voluntarily. These statements contradict the notion that Mosely positively and unequivocally consented to a blood draw. *See Carmouche*, 10 S.W.3d at 331 (consent must be positive and unequivocal). We infer that the trial court believed Mosely's statements because it ruled that Mosely did not consent to a blood draw. *See Cantu*, 253 S.W.3d at 282. We must defer to the court's belief that Mosely's statements were truthful. *See Crain*, 315 S.W.3d at 48 (we defer to trial court rulings that depend on evaluations of witness credibility and demeanor). As a result, we conclude that sufficient evidence supported the trial court's conclusion that Mosely did not

13

voluntarily agree to have his blood drawn. *See id.*; *see also Carroll v. State*, 916 S.W.2d 494, 503 (Tex. Crim. App. 1996) (trial court does not abuse its discretion if some evidence in the record supports its decision). We overrule the State's final issue.

## CONCLUSION

The trial court did not abuse its discretion by ruling that Mosely's blood was obtained unlawfully. Evidence supported the court's determination that Mosely did not voluntarily consent to a blood draw. Furthermore, because the State failed to carry its burden of establishing that Trooper Campos or Ha had probable cause to arrest Mosely, the State failed to carry its burden of establishing that an involuntary blood draw was constitutionally or statutorily permissible. We affirm the order suppressing the results of Mosely's blood test.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: July 28, 2011

Publish

14