

## In The
## Court of Appeals
## Sixth Appellate District of Texas at Texarkana

No. 06-12-00143-CR

PHILLIP GREGORY CROFTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law #1
Hunt County, Texas
Trial Court No. CR1101568

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

When Trooper Jason Walton first heard the motorcycle driven by Phillip Gregory Crofton, its engine was "being revved at a high rate of speed." Walton also heard the gears changing, indicating to him that the motorcycle was traveling fast. Walton turned and saw the motorcycle slowing, but still going "well over 65 miles per hour," the speed limit at that location. Walton engaged the overhead lights and siren on his vehicle and pursued Crofton. In response to Walton's pursuit, Crofton accelerated to over ninety miles per hour in a fifty-five mile-per-hour zone before stopping for Walton and yielding to Walton's investigative detention. During the traffic stop, Walton learned that Crofton was intoxicated. As a result, a Hunt County jury found Crofton guilty of his second driving-while-intoxicated (DWI) offense.[1]

On appeal, Crofton argues that the trial court erred in denying his motions to suppress evidence on the grounds that Walton did not have reasonable suspicion to begin the traffic stop and that the "blood draw evidence" was not obtained by Crofton's consent. We affirm the trial court's judgment because we conclude that (1) reasonable suspicion supported Walton's traffic stop of Crofton and (2) Crofton's consent to the blood draw was not coerced.

*(1)*     *Reasonable Suspicion Supported Walton's Traffic Stop of Crofton*

Crofton's argument against the traffic stop posits that Walton was not justified in his stated opinion that he saw Crofton speeding before activating his lights and siren and beginning his pursuit. Crofton's argument ignores his acceleration to speeds approaching ninety miles per hour in response to the lights and siren.

---

[1]Crofton was sentenced to 305 days' confinement in Hunt County Jail and assessed a $100.00 fine.

We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review.[2] *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd). While we defer to the trial court on its determination of historical facts and credibility, we review de novo its application of the law and determination on questions not turning on credibility. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *Graves*, 307 S.W.3d at 489. We also afford deference to a trial court's "application of law to fact questions," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 985 S.W.2d at 89.

A routine traffic stop implicates the United States and Texas Constitutions and must be reasonable. *Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984); *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996); *see* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. Law enforcement officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). To make an investigative stop, the officer must possess a reasonable suspicion based on specific articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to reasonably conclude the person detained actually is, has been, or soon will be, engaged in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 10 (1989); *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *Graves*, 307 S.W.3d at

---

[2]No findings of fact and conclusions of law were requested or made.

489; *Zervos v. State*, 15 S.W.3d 146, 151 (Tex. App.—Texarkana 2000, pet. ref'd). These facts must support more than a mere hunch or suspicion. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

An investigative detention is a confrontation of a citizen by a law enforcement officer during which the citizen "yields to a display of authority and is temporarily detained for purposes of an investigation." *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). "[T]he reasonableness of a temporary detention must be examined in terms of the totality of the circumstances." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). An individual is not "seized until he *has yielded* to a law enforcement officer's show of authority or when officers physically limit his movement." *Johnson*, 912 S.W.2d at 234–35 (emphasis added) ("It would be ludicrous to hold that these facts prove appellant was seized before he actually yielded to the orders of the arresting officers and stopped running away from them."). Thus, "events occurring after the initial show of authority by the officers, i.e., when the emergency lights were activated, until appellant finally pulled over, are relevant to a determination of reasonable suspicion." *Gilbert v. State*, 874 S.W.2d 290, 295 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). As a result, we can consider flight from a show of authority as a factor in support of a finding of reasonable suspicion. *Crivello v. State*, 4 S.W.3d 792, 805 (Tex. App.—Texarkana 1999, no pet.) (traffic stop justified, in part, by facts learned by officer while in pursuit); *Salazar v. State*, 893 S.W.2d 138, 141 (Tex. App.—Houston [1st Dist.] 1995, pet ref'd, untimely filed) (running from residence where officers are executing search warrant can be considered).

Walton testified that he heard "[a]n engine being revved at a high rate of speed."

4

> I could tell it wasn't sitting still because I could hear the gears changing. As the RPMs would change, I could hear the gears, you know, from first to second and so on. When then -- when I did finally saw [sic] the motorcycle, it was slowing. But I could tell it was traveling at a high rate of speed.
>
> Then when I identified what it was and more likely this guy was speeding on that -- on a state highway, he turned . . . . I went to turn behind him.

The speed limit on the road was sixty-five miles per hour. Walton estimated that the motorcycle "was going well over 65 on seeing it. It then slowed." We are faced with Crofton's appellate argument that Walton's estimate of speed, considering his margin of error, did not necessarily mean Crofton was observed speeding at the time. But Walton opined that Crofton was speeding when first observed. The trial court is entitled to believe that testimony. Thus, even if the reasonable-suspicion analysis were limited to what Walton observed before his show of authority, we would conclude that the trial court's finding of reasonable suspicion is supported by the evidence.

But, under the law, our analysis is not limited to just those first-observed facts. *See Crivello*, 4 S.W.3d at 805; *Salazar*, 893 S.W.2d at 141; *Gilbert*, 874 S.W.2d at 295. After Walton engaged the lights and siren on his patrol car in an attempt to stop Crofton, the motorcycle "[a]ccelerated quickly." Walton said, "[T]he driver hammered down on it and took off. Speeds—speeds greater—it was a 55 miles per hour zone there. And speeds greater than 90 miles an hour. Just hammered down on it." Eventually, Crofton turned into a driveway, enabling Walton to initiate contact with him.[3] It was confirmed to Walton, during the pursuit, that Crofton was clearly speeding.

---

[3]The contact produced evidence of Crofton's intoxication. Walton's "first opinion on talking to [Crofton], [was that] he was intoxicated." Crofton's speech was slurred, his eyes were "that red kind of watery," he smelled of

We find that Walton had reasonable suspicion based on articulable facts that Crofton committed the traffic offense of speeding. Not only did Walton testify to seeing the motorcycle "going well over 65," the posted speed limit, before initiating the patrol unit lights and siren, but he also witnessed its speed of over ninety miles per hour during the pursuit. The trial court was justified in ruling that Walton was authorized to make the investigative stop.

*(2)*      *Crofton's Consent to the Blood Draw Was Not Coerced*

Generally, a person's blood may not be drawn without his or her consent. Such a procedure constitutes a "search and seizure" for purposes of the Fourth Amendment, which typically requires the State to have probable cause before the fruits of such a search may be admissible in a trial against an accused. *Schmerber v. California*, 384 U.S. 757, 767 (1966); *State v. Moseley*, 348 S.W.3d 435, 443 (Tex. App.—Austin 2011, pet. ref'd).

A specimen of blood "may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person: (a) while intoxicated was operating a motor vehicle in a public place." TEX. TRANSP. CODE ANN. § 724.012(a)(1) (West 2011). Crofton argues that the blood draw was illegally obtained because "there was no search warrant." Consent, however, is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Montanez v. State*, 195 S.W.3d 101, 105 (Tex. Crim. App. 2006); *Cisneros v. State*, 165 S.W.3d 853, 856 (Tex. App.—Texarkana 2005, no pet.).

---

alcohol, and "[s]eemed to be unsteady on his feet." Crofton admitted to ingesting "one mixed drink" and that he had taken Valium and Hydrocodone three hours before the traffic stop.

Walton performed the horizontal gaze nystamus field-sobriety test on Crofton, who exhibited six out of six clues of intoxication. Signs of intoxication were also noted on the "finger count test" and recitation of the alphabet. Walton concluded that Crofton was intoxicated and arrested him for DWI.

Walton testified that Crofton was "very cooperative" and consented to a blood test. Licensed vocational nurse, Marvin Doolittle, conducted the blood draw. He testified that Crofton consented and that he "was actually pleasant."[4] The proper statutory warnings were given to Crofton in writing, and neither the officer nor Crofton indicated on that form that Crofton was refusing the blood draw.[5]

Crofton testified for the limited purpose of supporting the motion to suppress. He claimed that he "had asked for a breath test in the field," but that Walton refused him and told him they were going to take his blood. Walton explained that, if he did not consent, that the police department "would have a warrant within the next 10 to 15 minutes anyway, so it wouldn't make any difference." Walton explained that the jail was having a "no-refusal weekend in the sense that we were -- they had someone at the jail for us that -- that would be able to obtain the blood if they gave it voluntarily or to take it there if we needed to get a search warrant."

Testimony from Walton and Doolittle supported a finding that Crofton consented to the blood draw. Nowhere in Crofton's testimony did he claim refusal of consent. Therefore, the court was free to find that consent to the blood draw was established.

Crofton also argues that his consent was coerced because, "[w]hen told that refusing would make no difference, Crofton did not put up a fight." A driver's consent to a blood test must be free and voluntary, and it must not be the result of physical or psychological pressures

---

[4]Forensic scientist, Chris Yongkin, testified that Crofton's blood sample yielded a blood-alcohol level that was over twice the legal limit.

[5]Had Crofton wanted to refuse consent, the form contained a space where he could indicate refusal by his signature.

brought to bear by law enforcement. *Fienen v. State*, 390 S.W.3d 328, 332 (Tex. Crim. App. 2012) (citing *Meekins v. State*, 340 S.W.3d 454, 458–59 (Tex. Crim. App. 2011)). The ultimate question is whether the person's "will has been overborne and his capacity for self-determination critically impaired" such that his or her consent to search must have been involuntary. *Id.* (citing *Schneckloth*, 412 U.S. at 225–26; *Meekins*, 340 S.W.3d at 459). "The validity of an alleged consent is a question of fact, and the State must prove voluntary consent by clear and convincing evidence." *Id.* (citing *State v. Weaver*, 349 S.W.3d 521, 526 (Tex. Crim. App. 2011)). In determining whether the "defendant's will was overborne" when he or she gave consent, courts look at the circumstances leading up to the search, the reaction of the defendant to pressure, and any other relevant factor. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). This is a question of fact which is reviewed for an abuse of discretion. *Dunn v. State*, 176 S.W.3d 880, 881 (Tex. App.—Fort Worth 2005, no pet.).

Crofton argues that his consent was given as a result of Walton's statement that he would be able to obtain a warrant to test Crofton's blood in the event consent was refused. Crofton characterizes the statement as information "that would normally result in considerable psychological pressure on a D.W.I. suspect to consent to the taking of a blood sample." However, at trial, both Walton and Doolittle testified that consent was given voluntarily and described Crofton as cooperative and pleasant.[6] Crofton was provided with a form informing him of his right to refuse consent, but he did not sign the form. He had previously been arrested for DWI, and there was no suggestion that he was unintelligent about his rights, that the

---

[6]Although Crofton testified at trial, he did not claim that the blood test was taken involuntarily or was the result of coercion.

detention was lengthy, that questioning was repetitive, or that he was subjected to physical punishment.

A statement by a police officer informing an accused that he "could have been taken to the hospital and a blood search warrant obtained" was "not coercive when the surrounding circumstances" are considered, including facts giving rise to probable cause to arrest the defendant for DWI that are established before transport to jail. *Fienen*, 390 S.W.3d at 335 (characterizing statement by officer as merely "conveying what would happen in more definite terms than suggested by the (present) statute") (citing *Johnson v. State*, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990) (consent given after officer's threat to seek search warrant held voluntary), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 685 n.6 (Tex. Crim. App. 1991); *Beaupre v. State*, 526 S.W.2d 811, 815 (Tex. Crim. App. 1975)); *see Lackey v. State*, 638 S.W.2d 439, 449 (Tex. Crim. App. 1982); *Grant v. State*, 709 S.W.2d 355, 357–58 (Tex. App.—Houston [14th Dist.] 1986, no writ). Under the totality of the circumstances, we cannot say that the trial court's finding of voluntariness was "clearly erroneous." *Fienen*, 390 S.W.3d at 335.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:    March 25, 2013
Date Decided:      April 4, 2013

Do Not Publish

9