# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00807-CR

**Jonathan Jeremiah Nunnally, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 18-0301-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In Texas, a trial judge has wide latitude in assessing a defendant's particular punishment from the statutory range; reviewing courts do not have the same ability. The trial court here sentenced Jonathan Jeremiah Nunnally to 20 years in prison for the first-degree felony of aggravated assault by threat against a public servant. *See* Tex. Penal Code § 22.02(a)(2), (b)(2)(B). First-degree felonies can be punished by sentences of 5 to 99 years. *Id.* § 12.32(a). In five appellate issues, Nunnally contends that in his particular circumstances, a 20-year sentence violated Penal Code section 1.02; the Eighth Amendment; the Fourteenth Amendment; and article I, sections 13 and 19, of the Texas Constitution. We affirm because the evidence supported the trial court's conclusion that a 20-year sentence served several statutory objectives, the sentence was not grossly disproportionate to the offense, and Nunnally has not shown the requisite arbitrariness or bias needed for a reversal for a deprivation of due process.

## BACKGROUND

In the pre-dawn hours of February 7, 2018, the 22-year-old Nunnally was blacked out in the driver's seat of his girlfriend's car, which was parked at an intersection on a highway feeder road. Williamson County Sheriff's Deputy Tabytha Horseman was driving by and saw Nunnally's car sit at the intersection through two red-light cycles. Deputy Horseman approached on foot to check on Nunnally and to investigate the potential offenses of obstruction of a roadway and DWI. When she opened the car door, she could smell marijuana and metabolized alcohol and saw Nunnally breathing but not moving. Once she roused him, his foot came off the brake, and the car started rolling. She told him to stop, which he did, and to hand over his keys, which he also did. She put the keys on the roof of the car.

Nunnally appeared "panicked" and "shocked" and seemed to be without his "mental faculties." His speech was so slurred that she could not understand it, except she heard him ask "if anyone was coming." She interpreted that as an expression of an intent to flee because it could be easy to outrun just one officer. Nunnally searched his pocket for his ID, produced another set of keys, and tried to put them into the radio. He then put the keys in the ignition and turned the car on, and Deputy Horseman tried to take the keys out. Nunnally put his foot on the gas, and the car took off. Deputy Horseman lost her footing, grabbed the steering wheel, and put her left foot in the door frame to steady herself while the car was moving. It began moving so fast that she could hear the wind and would be in danger if she tried to jump out. She was afraid that falling out of the car would have killed her, much like a local officer had been killed in a similar incident not long before. That officer had tried to gain control of a vehicle and then was run over after being ejected from the vehicle. Nunnally "actively f[ought] for control over the steering wheel" and turned his body so he could kick her out of the car. He succeeded in kicking her,

2

bruising her legs. She tased him, causing him to fall over, and got the car in park. A search of the car revealed marijuana and cough syrup.

The State indicted Nunnally for aggravated assault against a public servant, with Paragraph 1 of the indictment alleging aggravated assault by threat and Paragraph 2 aggravated assault by causing bodily injury. Both paragraphs alleged the use of a deadly weapon—the car. Nunnally pleaded guilty to aggravated assault by threat and went open to the court for punishment. In exchange for the plea, the State "waive[d] punishment in excess of" 20 years in prison.

The trial court held a punishment hearing, at which Deputy Horseman and a colleague of hers testified. Nunnally also put on evidence—testimony by his mother and himself and exhibits. His mother testified that he had abused alcohol and drugs going back to high school and had been arrested several times, for possession of marijuana, possession of a controlled substance, and a DWI. The drug abuse continued after high school, graduating to heavier drugs, and Nunnally would disappear at times. He sought in-patient drug treatment but was turned away. Even so, his mother testified, he was not "owning up to his issues" before the assault on Deputy Horseman. Only after his being jailed for the offense has Nunnally begun to improve.

Nunnally testified similarly. Just two months before the assault, he had been put on felony probation for unauthorized use of a motor vehicle. And his drug use during the time before the assault had him blacking out "[l]ike it was normal." About the night in question, he had no memory of anything between his taking a combination of Xanax, promethazine, alcohol, and codeine at home and waking up in booking after the assault. He explained that things have changed for him since being in jail. It is the longest that he has been sober in some time, and he now realizes that he has a drug problem and so is making different choices. He attends AA classes once a week in jail and has learned how to cope with substance abuse and deal with problems rather than

3

medicating them away. He has been diagnosed with PTSD, likely stemming from past head injuries from sports and one from when he was attacked. He takes responsibility for what happened with Deputy Horseman and wanted her to know that he never intended to hurt her. He also admitted that prison sentences send messages both to the offender and to the community and believed that whatever the court would choose as his sentence, including "up to the 20 years," would be the court's doing what it thinks is right.

After the close of the evidence and arguments by counsel, the trial court recessed the hearing to consider the parties' positions and to review the exhibits, including dashcam footage. Twenty-four minutes later, the court returned and said that it needed more time to review all the exhibits and consider the testimony and so recessed the hearing until the following morning. That next morning, the court explained that it had considered both sides' evidence, the use of a deadly weapon during the assault, Nunnally's personal history, and his remorse. The court emphasized that it rewatched the dashcam footage several times, which led it to conclude that "what happened demonstrated no regard for Deputy Horseman's life." The court sentenced Nunnally to 20 years in prison, a sentence that he now appeals.

## DISCUSSION

### I. The sentence serves several statutory objectives.

We address Nunnally's statutory issue before addressing his constitutional issues. In his fifth issue, Nunnally contends that his sentence "violated Texas Penal Code § 1.02 for failing to serve a legitimate penological goal." He argues that although it is a legitimate penological goal, "[r]etribution is not a sufficient rationale to support this sentence" because he "was intoxicated at the time of the offense" and not acting with "cold blooded premeditat[ion]." He adds that the legitimate goal of deterrence does not support the sentence either because he is not such a repeat

4

offender as to be subject "to a recidivist statute" like those for enhancement or habitualization. And he further argues that offenders who are as intoxicated as he was would never conduct "a cost–benefit analysis" of potential punishment and be deterred. He concludes that rehabilitation "is the most appropriate sentencing goal" for him and that his sentence did not serve this goal.

A trial court "is given wide latitude to determine the appropriate sentence in a given case," and we must not interfere with a sentence absent an abuse of discretion. *See Tapia v. State*, 462 S.W.3d 29, 46 (Tex. Crim. App. 2015); *Foster v. State*, 525 S.W.3d 898, 911 (Tex. App.—Dallas 2017, pet. ref'd). We may not disturb a trial court's decision on an issue within its discretion unless the decision was arbitrary or unreasonable and outside the zone of reasonable disagreement. *See State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016); *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Nicholas v. State*, 56 S.W.3d 760, 765 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (applying abuse-of-discretion standard to sentencing); *Greenwood v. State*, 948 S.W.2d 542, 546 (Tex. App.—Fort Worth 1997, no pet.) (same).

Because of this wide discretion, reviewing courts' ability to disturb sentences for a term of years that are within the relevant statutory range is limited: "Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal." *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006); *see also Barrow v. State*, 207 S.W.3d 377, 379–80 (Tex. Crim. App. 2006) ("The decision of what particular punishment to assess within the statutorily prescribed range for a given offense is a normative, discretionary function.").

Penal Code section 1.02 requires courts to "construe[]" the "provisions of" the Penal Code "to achieve the following objectives":

5

(1) to insure the public safety through:

   (A) the deterrent influence of the penalties hereinafter provided;

   (B) the rehabilitation of those convicted of violations of this code; and

   (C) such punishment as may be necessary to prevent likely recurrence of criminal behavior;

(2) by definition and grading of offenses to give fair warning of what is prohibited and of the consequences of violation;

(3) to prescribe penalties that are proportionate to the seriousness of offenses and that permit recognition of differences in rehabilitation possibilities among individual offenders;

(4) to safeguard conduct that is without guilt from condemnation as criminal;

(5) to guide and limit the exercise of official discretion in law enforcement to prevent arbitrary or oppressive treatment of persons suspected, accused, or convicted of offenses; and

(6) to define the scope of state interest in law enforcement against specific offenses and to systematize the exercise of state criminal jurisdiction.

Nunnally does not point out what provision of the Penal Code he believes the trial court misconstrued. *See* Tex. Penal Code § 1.02 (requiring "the provisions of this code" to "be construed[] to achieve" specified "objectives"). If Nunnally is arguing that the trial court misconstrued the statute that provides the punishment range, then despite his arguments, the trial court indeed discharged the duty that that statute imposed on it—it imposed a sentence between 5 and 99 years long. *See id.* § 12.32(a).

Further, a trial court does not abuse its discretion if some evidence in the record supports its decision. *See State v. Mosely*, 348 S.W.3d 435, 443 (Tex. App.—Austin 2011, pet. ref'd); *Davila v. State*, 173 S.W.3d 195, 197 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.); *Brumbalow v. State*, 933 S.W.2d 298, 300 (Tex. App.—Waco 1996, pet. ref'd). Here, the record

6

supports the trial court's decision that a 20-year sentence serves several objectives listed in Penal Code section 1.02. On cross-examination, Nunnally admitted that driving while intoxicated threatens the public and has killed many people, even when the intoxicated driver did not intend to kill anyone. He affirmed that sentences should "send[] a message to other people in this community that you can't do this kind of stuff" and that that stuff included his having put Deputy Horseman's life at risk, much like what had recently led to another deputy's death when flung from a car while trying to apprehend the driver. All this supports a finding of the "deterrent influence," *see* Tex. Penal Code § 1.02(1)(A), of the 20-year sentence on others in the community.

Because of this same evidence, the sentence also served the statutory punishment objective. *See id.* § 1.02(1)(C). In addition, Nunnally, although otherwise slurring his speech when with Deputy Horseman, asked whether anyone was coming to help her. The trial court reasonably could have interpreted that question like Deputy Horseman did—as Nunnally's probing for the likelihood of successfully fleeing—and reasonably have concluded that Nunnally was planning to cause a chase, which would have endangered him, Deputy Horseman, and probably the public. He also kicked Deputy Horseman, nearly knocking her out of the fast-moving car. All this supported the court's observation that Nunnally had "no regard" for the deputy's life, thus making his conduct particularly deserving of punishment.

Even for purposes of rehabilitation, there was evidence that imprisoning Nunnally for a term of years would serve rehabilitative purposes. Both he and his mother testified that he had taken responsibility for his drug abuse seriously only after being jailed for this offense. He admitted that he had been on felony probation for two months at the time of this offense, that one of the probation conditions was not using illegal drugs, and that he violated that condition anyway. While jailed, he had started receiving treatment, including AA classes, getting a PTSD diagnosis,

7

and learning how to cope with substance abuse and deal with problems rather than medicating them away. Thus, despite the undoubted rehabilitative benefits that come with avoiding prison, in Nunnally's particular circumstances, only after being jailed has he fully confronted his drug abuse and received continuing treatment for it.

For all these reasons, the sentence served deterrent, punishment, and rehabilitative objectives, and therefore helped ensure public safety, and was not oppressive. *See id.* § 1.02(1), (5). Nunnally also had fair warning, *see id.* § 1.02(2), that he could receive a 20-year sentence for the charge. Twenty years is within the statutory range for the offense, and Nunnally believed that whatever the trial court chose for the sentence, including "up to the 20 years," amounted to the court's doing what it thought was right. We hold that the court did not abuse its sentencing discretion in light of Penal Code section 1.02 and overrule Nunnally's fifth issue.

## II.    The sentence is not grossly disproportionate to the offense, under the state and federal constitutions.

Nunnally's first and second issues invoke his constitutional protections against punishments that are cruel, unusual, or both. In his first issue, he contends that his sentence is grossly disproportionate to his offense, in violation of the Eighth Amendment. In his second issue, he contends that the sentence is similarly grossly disproportionate, under article I, section 13, of the Texas Constitution. Although the two constitutional provisions differ slightly—the Eighth Amendment forbids "cruel and unusual punishments" while its Texas analogue forbids "cruel or unusual punishment"—there is "no significance in the difference" between the words used. *Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997). As a result, we conduct one "gross disproportionality" analysis to review Nunnally's first and second issues.

8

Proportionality "is embodied in the Constitution's ban on cruel and unusual punishment and requires that punishment be graduated and proportioned to the offense." *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016). "But, this is a narrow principle that does not require strict proportionality between the crime and the sentence." *Id.* "Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* "[A] sentence is grossly disproportionate to the crime only in the exceedingly rare or extreme case." *Id.* at 322–23. Punishment "within the statutory limits . . . is not excessive, cruel, or unusual." *Id.* at 323.

To determine whether a sentence for a term of years is grossly disproportionate to the offense, we first consider three factors: "a court must judge the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses." *Id.* "In the rare case in which this threshold comparison leads to an inference of gross disproportionality, the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id.* "If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." *Id.*

Under the three threshold factors, we conclude that Nunnally's 20-year sentence does not give rise to an inference of gross disproportionality. First, Deputy Horseman was injured by Nunnally's kicking her. His actions also could have killed her, like another sheriff's deputy not long before. We therefore see harm caused to Deputy Horseman while she was lawfully discharging her official duties and significant harm threatened against her. *See id.*

Second, Nunnally bore some culpability for this offense. *See id.* Even though he testified that he had no memory at all of what happened, he, by his own admission, had abused

9

drugs for some time and abused them on the night of the incident. His mother knew him to have abused drugs and fail to "own up" to those issues. Reflecting his knowledge of his own culpability, he testified that he takes responsibility for what he did that night.

Finally, his prior offenses also support a more-than-minimal sentence. Again, he abused drugs for some years and did so on the night of the incident in violation of the terms of his felony probation, imposed just two months earlier. The trial court could consider that felony plus the unspecified number of arrests for drug offenses and DWI. *See id.*

Based on the three threshold factors, we conclude that the 20-year sentence within the statutory range of 5 to 99 years does not give rise to an inference of gross disproportionality. We thus need not compare the sentence to others for the same offense in Texas and elsewhere and overrule Nunnally's first and second issues.

### III. Nunnally has not shown the arbitrariness or bias needed to support a reversal for a due-process violation.

Nunnally's third and fourth issues assert violations of the due-process and due-course-of-law protections from the federal and state constitutions, respectively, arguing that the trial court violated those rights "by failing to adequately consider the extensive mitigation evidence." The trial court has wide latitude to decide the appropriate sentence in each case. *Tapia*, 462 S.W.3d at 46. "We cannot step into the shoes of the trial court judge and substitute our judgment for hers unless that judge has clearly abused her discretion." *Id.*

A trial court denies a defendant due process during the punishment phase if it arbitrarily refuses to consider the entire range of punishment or any mitigating evidence and imposes a predetermined sentence. *See Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014); *Ex parte Brown*, 158 S.W.3d 449, 454–56 (Tex. Crim. App. 2005). Due process requires

10

a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). Without a clear showing of bias, we presume a trial court was neutral and detached. *See Tapia*, 462 S.W.3d at 44; *Brumit*, 206 S.W.3d at 645.

Nunnally has not made the required showing of an abuse of sentencing discretion violating his due-process rights. He points us to nothing in the record suggesting that the trial court expressed bias or refused to consider either a lower sentence within the statutory range or his evidence. *See Brumit*, 206 S.W.3d at 645. Instead, the trial court heard evidence from both the State and Nunnally over a half-day hearing and reviewed the exhibits offered. It recessed the hearing overnight for more time to consider the competing evidence and arguments. Included in the evidence considered was a pre-sentence-investigation report. The court told the parties that it considered everything that Nunnally and his mother testified to but also noted that he had used a deadly weapon and said that he had no regard for Deputy Horseman's life, an inference supported by the evidence. Because the trial court heard and said that it considered all the evidence, which necessarily includes the mitigating evidence, the trial court did not abuse its sentencing discretion by choosing a punishment within the statutory punishment range at the top of what the State said it would seek in exchange for Nunnally's plea. *See id.* This is not an instance in which the sentencing decision was based on "nothing at all." *See Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984) (reversing sentencing decision as violation of Texas Constitution's guarantee of due course of law because decision was based on "nothing at all"—"no evidence of the offense, no information about the defendant, no punishment evidence, no plea bargain").

The record does not reflect any statements by the trial court suggesting either bias or any refusal to consider his evidence or a lower sentence. Nunnally thus has not affirmatively

11

shown an abuse of sentencing discretion. *See Tapia*, 462 S.W.3d at 44; *Brumit*, 206 S.W.3d at 645; *see also Ex parte Chavez*, 213 S.W.3d at 323–24 ("Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal."); *Barrow*, 207 S.W.3d at 379–80 ("The decision of what particular punishment to assess within the statutorily prescribed range for a given offense is a normative, discretionary function."). We overrule Nunnally's third and fourth issues.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed:   October 28, 2021

Do Not Publish

12